[Crim. No. 2882.   First Dist., Div. Two.   July 27, 1953.]

THE PEOPLE, Respondent, v. ROBERT A. RANSON, Appellant.

Robert W. Sinai for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Arlo E. Smith, Deputy Attorney General, for Respondent.

DOOLING, J.—Shortly after midnight on March 30, 1952, in the San Francisco Civic Center the defendant and appellant successively shot and killed two young men and wounded three others. He was charged by indictment with the murder of the two who died and with assault with intent to commit murder upon the three others. The jury found him guilty of

murder in the first degree of Norman Bothelo with recommendation of imprisonment, murder in the second degree of Andrew Ulibarri, and assault with intent to commit murder on the other three counts.

The jury was properly instructed, almost in the language of *People* v. *Bender,* 27 Cal.2d 164, 183 [163 P.2d 8], as to what constitutes the premeditation and deliberation necessary in the commission of murder in the first degree and no complaint of these instructions as to form or sufficiency is made by appellant. He does, however, argue earnestly that the evidence is not sufficient to support the jury's finding of deliberation and premeditation in the killing of Bothelo, implicit in its verdict of first degree murder.

The evidence shows that appellant had apparently never met Bothelo prior to March 1, 1952, and never saw him again until the night preceding the early morning of the shooting. On March 1st appellant and several of his friends called at the home of Edith Apodaca. There they met Bothelo and a group of his friends. Bothelo and his friends are described by some of the witnesses as belonging to the "Fillmore gang" and appellant and his friends to the "Portola gang." The two groups while at Miss Apodaca's home remained aloof from one another. Bothelo and his friends left Miss Apodaca's home first. A few minutes later appellant and his friends also left. Bothelo and some of his friends (the number is in dispute), were still on the sidewalk and unfriendly words were exchanged and some jostling between members of the two groups occurred. Appellant then drew out a .45 automatic revolver and told Bothelo and his friends to "freeze." One of them, Hinmon (afterwards wounded by appellant in the March 30th affray), approached appellant and was struck by him on the head with the automatic. There was a further angry exchange of words and appellant and his friends left in the automobile in which they had come.

On the night preceding the shootings a large dance and entertainment was held in the civic auditorium. Both appellant and Bothelo attended. Bothelo was unarmed but appellant carried his .45 automatic in a shoulder holster. During the evening appellant was told by a friend that Bothelo, in appellant's own words, "was looking for me." Shortly before the dance ended appellant walked up to Bothelo and, quoting appellant's testimony: "I walked up to him. He was sitting there on the side. I asked him if he was looking for me. He says: 'Yeah.' And I says, 'O.K. we'll——,' I said, 'O.K.

we'll have it out.' He said, 'Is it going to be cool?' I says, 'Yes.' . . .

"Q. When he said, 'Is it going to be cool?' and you said, 'Yes,' what did that mean . . .?

"A. Well, it could have been two things; first it was just me and him, him and I was going to fight alone . . . Or it could have meant if I was going to use the gun . . . I think I said, 'I will meet you over in the park, in the Plaza across the street.'

"Q. And what did he say? A. 'O.K.' "

Appellant left the auditorium first with some of his friends and waited in the civic center plaza near one of the fountains. Some time later Bothelo and some of his friends followed. What thereafter ensued is the subject of a great amount of conflicting testimony. Appellant and his witnesses have appellant and only three others arrayed against Bothelo and a group of 25 or 30 young men. Other witnesses testified that the groups on each side were about equal in number. Appellant and his witnesses have this larger group gradually forcing appellant and his three friends backward until their backs were almost against the edge of the fountain. Other witnesses have the two groups practically equal in numbers approximately standing their ground on either side. These conflicts were for the jury to resolve and we must assume in favor of the verdicts that they believed the evidence most favorable to the prosecution. We take, as representative of such evidence, the testimony of Hinmon as to what happened.

According to Hinmon, Bothelo left the auditorium with two young women, one of them Edith Apodaca. Bothelo met Ulibarri and the two walked into the plaza with Hinmon and one McMenomy following them. The four met Allione, a friend of the appellant and three or four other young men. They approached them and "we started arguing, and we started mixing it up a little bit . . . not exactly blows, shoves or pushes and stuff. Then Ranson came out of the bushes, behind the hedge, one tall shrub there on the left. . . . He drew his gun and held his gun out at his hip . . . he held the gun there and said, 'Which one wants it first?' And Ulibarri said, 'Well you can start with me.' . . . And Norman Bothelo told him to put the gun down, if he wanted to fight him fair, throw the gun away and he would fight him. Then the argument started, and I don't know what was said from then on until the girls rushed him, Edith Apodaca and the other girl." There were no weapons used before appellant

appeared, "just hands." When appellant first appeared he said, "Freeze," and then "Which one wants it first?" No one moved after that until the girls rushed him, "then somebody from the sideline pulled the girls away from him, from Ranson, and—then he started shooting. . . . First he shot Norman Bothelo, and the bullet knocked him backwards and he fell down, and he sort of paused, and then, then he started shooting again." He swung the gun from his right to his left as he continued shooting. "First Ulibarri and Erickson and myself, and . . . Bennett." After Ranson shot Bothelo nobody rushed toward Ranson. "Everybody just stopped still, stood still." He saw nobody in the plaza with any weapon except Ranson, no bottles, sticks, knives, belts, "there were no other weapons at all."

On cross-examination it was developed that Erickson and Bennett arrived after the encounter was underway.

Bennett testified that he followed Hinmon and McMenomy into the plaza and in general corroborated Hinmon's testi-- mony. Erickson testified that when he arrived at the plaza "I remember seeing Ranson pull out a gun and saying, 'Who wants it first?' I was feeling pretty good, and I don't remember very much where I went." He did not see Bothelo, he did not hear the shots. The next thing "I remember laying on the ground waiting for the ambulance to come."

A prosecution witness, Hooks, who took no part in the affair, corroborated the evidence that the two groups engaged were about equal in number, that appellant and his group were not forced backward by their opponents before the shooting and that nobody else had any weapons except the appellant. There were six or seven facing Ranson and "three or four other guys with him." Behind Bothelo's group there were 15 or 20 other people, some of these were older people, most of them were standing there and others just walking through. Hooks from the time he arrived saw no fighting or scuffling. The two groups were just standing there facing one another. He saw appellant draw his gun and tell them "to freeze." Bothelo said: "Put it down and I'll fight you fair." Appellant said: "Who wants it first?" Somebody said: "Shoot the sons of bitches, they won't move" and then appellant started firing. He kept his gun pointed at all times toward Bothelo and Bothelo was the first one that he shot.

There was much testimony produced by appellant, as we have indicated, contradictory of this version of the en-

counter but accepting this testimony, as we must assume the jury did, there was sufficient from which the jury could reasonably conclude that before going into the plaza, when appellant challenged Bothelo to fight him and assured him that the encounter would be ''cool,'' knowing all the while that he was armed with an automatic, appellant had formed the deliberate and premeditated intent to shoot Bothelo; that he concealed himself behind the shrubbery in furtherance of this predetermined plan, and after Bothelo and his friends had arrived in the plaza he stepped out from the shrubbery, drew his gun and shot Bothelo as he had planned.

The inferences were for the jury to draw and we cannot say that the inference suggested is not supported by the evidence above set out.

The jury's verdicts indicate clearly that the jurors were impressed with the distinction between the two degrees of murder. They found appellant guilty of murder in the first degree in the shooting of Bothelo, the one whom appellant had previously challenged, the one whom he first confronted with the gun and the one at whom he fired the first shot. As to Ulibarri, the second one killed, there was no such showing from which deliberation and premeditation might be inferred, and as to Ulibarri the jury found the crime to be second degree murder.

Appellant also insists that the evidence ''shows beyond all cavil that the appellant had good reason to apprehend great bodily harm and, therefore, the shooting was in lawful self-defense.'' In support of this defense much evidence was introduced of the brutal fighting methods of the ''Fillmore gang,'' the fact that appellant had been warned after the March 1st incident that the ''Fillmore gang'' was out to get him, the defense testimony (contradicted by the prosecution witnesses), that Ranson and his group were confronted by overwhelming numbers and were gradually forced backward to the fountain, evidence that someone just before the shooting approached Ranson with a coat which he endeavored to throw over Ranson's head, and the fact that the two young women made their unsuccessful effort to prevent appellant from using his gun.

Self-defense is a question of fact and requires in the actor a real fear of serious bodily injury and an appearance of danger of such injury which would arouse such fear in the mind of a reasonable man. ''It must appear not only that he believed himself in such peril, but that, as a reason-

able person, he had sufficient grounds for his belief.'' (13 Cal. Jur., Homicide, § 42, p. 638.)

In determining whether appellant actually believed himself in imminent peril of serious bodily injury the jury had appellant's own testimony concerning Bothelo just before appellant shot him: ''I didn't think he was going to do anything at all. . . . I didn't think he would try anything. I didn't think he was going to try anything or would try anything.'' Coupled with this was the fact that the jury had before it evidence from which it could find that there were no other weapons of any sort exhibited, that the numbers opposed to one another were not disproportionate, that except for the effort of the two young women to prevent the shooting (which was thwarted by one or more of appellant's companions) no one opposed to appellant and his companions advanced after appellant drew the gun and ordered them to ''freeze,'' but all thereafter remained standing where they were, and that there was also testimony that no one approached appellant with a coat in his hands. There was ample testimony, if believed, from which the jury could find that there was neither the appearance of danger of serious injury from the viewpoint of a reasonable man nor the fear of such danger in the mind of appellant. ''It is for the jury to determine whether, as a reasonable man, the defendant was justified in believing himself in danger.'' (13 Cal.Jur., Homicide, § 42, p. 640.)

Appellant complains of the refusal to give certain proposed instructions on self-defense and of the form of certain instructions given by the court on that subject. Some of these proposed instructions had to do with the right of appellant to act on appearances. Among other instructions given the jury on this particular subject was the following:

''You will note that actual danger is not necessary to justify self-defense. If one is confronted by the appearance of peril which arouses in his mind, as a reasonable person, an honest conviction and fear that he is about to suffer death or bodily harm, and if a reasonable man in a like situation, seeing and knowing the same facts, would be justified in believing himself in like danger, and if the person so confronted acts in self-defense upon such appearances and from such fear and honest convictions, his right of self-defense is the same whether such danger is real or merely apparent. Even if in the light of after-acquired information or from the distance or perspective of the jury box it should appear that

there was no actual or only slight danger, that fact would not affect the right of self-defense if the appearances establishing that right, as I have stated them, existed.''

This instruction amply covered the doctrine of the right to act on appearances. ██ It is a commonplace that a defendant is not entitled to have instructions couched in any particular language so long as the instructions given fully and fairly state the applicable law.

██ Appellant's other proposed instructions dealt with the general principles of self-defense and the fact that where the right to act in self-defense exists one is not compelled to flee but may stand his ground. On the right to stand his ground the jury was instructed: ''The law of this state does not require that a person retreat before he may act lawfully in self-defense. Although one stands his ground or even pursues the adversary until he, the former has secured himself from danger, if his actions are in lawful, justifiable self-defense, as allowed by and within the law just stated to you, such actions do not constitute a crime even if they cause death. Under such conditions, this rule applies even if it should appear that the self defending person might more easily have gained safety by withdrawing from the scene or by flight.'' Appellant could not properly ask for a more favorable instruction on this phase of the law of self-defense.

██ The general doctrine of self-defense was stated by the court in this language:

''A homicide is justified and not punishable when committed by a person in the lawful defense of himself, when he has reasonable ground to apprehend that he is in danger of death or great bodily injury, and that there is imminent danger of such a design being accomplished. . . . The law of self-defense is founded on the principle of necessity, either actual or apparent, and in order to justify the taking of human life on this ground the slayer, as a reasonable man, must have reason to believe and must believe that he is in danger of receiving great bodily harm; and further, the circumstances must be such that an ordinarily reasonable person, if he were in those circumstances and if he knew and saw what such person in real or apparent danger knows and sees, would believe that it was necessary for him to use, in his defense, and to avoid great bodily injury to himself, such force or means as might cause the death of his adversary.

''A bare fear that a person's life or limb is in danger is not sufficient to justify a homicide. To justify taking the

life of another in self-defense, the circumstances must be such as to excite the fears of a reasonable man placed in a similar position, and the party killing must act under the influence of such fears alone. The danger must be apparent and must be present and imminent, or must so appear at the time to the slayer as a reasonable man, and the killing must be done under a well founded belief that it is necessary to save oneself from death or great bodily harm.

"If from the evidence in this case, you should have a reasonable doubt whether or not the killing . . . was justifiable under the law as stated to you in my instructions, your verdict must be that the defendant was not guilty."

These instructions are characterized by appellant as "negative and colorless." They correctly state the law and, taken as a whole, the instructions herein quoted and the others given on the subject fully and fairly covered all of the elements of the law of self-defense.

Appellant complains of instructions given that one who has induced a quarrel or made a felonious assault on another is not entitled to act in self-defense unless he first in good faith declines further combat. Not only did the evidence above recited fully justify the giving of such instructions, but appellant himself proposed an instruction (the failure to give which he urges elsewhere as error) containing the similar language: "but such person . . . if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed." (Pen. Code, § 197, subd. 3.)

Appellant's suggestion that there is no evidence of the killing of Ulibarri by him, or even that Ulibarri is dead, is without substance. Appellant himself produced two witnesses: Dr. Moon, a pathologist from the coroner's office, who testified on direct examination by appellant's attorney to tests made by him on the body of Ulibarri; and Dr. Hine, a toxicologist, who similarly testified to the result of another test made on Ulibarri's body. That Ulibarri was shot by appellant appears from the testimony of Hinmon and Miss Larsen, and that he died from the gun wound was proved by the testimony of Dr. Warrens. The assertion that Dr. Warrens did not know that the body about which he testified was that of Ulibarri is not borne out by anything which appears in the transcript of his testimony. The appellant testified that he only fired four shots. The witness Larsen

testified that she heard five reports; but even if only four shots were fired the evidence establishes without any contradiction that five persons suffered gunshot wounds. If only four shots were in fact fired the only rational conclusion is that one of the bullets wounded two persons.

Finally appellant complains of the introduction of certain evidence and the failure to sustain objections to certain cross-examination. In considering the propriety of these rulings it is necessary to recount at somewhat greater length the nature of a portion of the testimony given by appellant in support of his claim of self-defense. He began by testifying that for several years he had been a participant in gang fights and that in these fights weapons such as belts, chains and home-made blackjacks had been used; that the Fillmore gang ''use any kind of weapon, lead and iron knuckles, throwing acid in the guy's face.'' He had heard of two of his friends being badly hurt in fights with the Fillmore gang. The previous Halloween he was present when a friend had been jumped by the Fillmore gang and only escaped when a police officer appeared. As a result of the fear that he felt at that time for his own safety ''that is when I first got an idea of carrying the gun.'' His reason for carrying the gun was: ''For protection against—in case I got caught alone.'' He further testified that he only carried the gun when he was going ''out of my district . . . close to Fillmore or to a big dance or party.'' His purpose in carrying the gun was just in case trouble developed. ''Q. . . . Before the ball, did you ever pull the gun on anybody aside from this altercation at Edith Apodaca's house? A. No, sir.''

The obvious purpose of this line of testimony developed on the direct examination of the appellant was to persuade the jury that appellant procured and carried the gun motivated by the fear that he might suffer serious injury in a gang fight, that he carried it only for protection against such a contingency, that he carried it only when he was going out of his own district where he might be assaulted by some gang and particularly the Fillmore gang, and that he had never previously used it against anybody except on the one occasion when threatened by members of the Fillmore gang outside of Miss Apodaca's house on the March 1st preceding the shootings in the civic center.

In support of this theory the defense witness Allione testified on direct examination: ''So far as I know, every time he left the district he took it (the gun) with him. Q. Are

those the only times he took the gun as far as you know? A. That's right . . . more or less every time he went downtown towards the Fillmore or to a show."

Against this background Allione was asked about an incident when he was in an automobile with appellant when they picked up two sailors and appellant pointed the gun at the sailors and afterwards struck them over the head with the gun. He denied that such an incident had occurred. Allione was then asked if he had not told certain named police officers at a time and place specified that such an incident occurred. He denied this. One of the police officers was called in rebuttal and testified that Allione had made such a statement.

In view of appellant's own testimony that he never used the gun upon anybody, except on the one occasion outside of the Apodaca home, before the morning of the shootings and Allione's corroborative testimony that appellant only carried it when he was going "downtown towards the Fillmore or to a show," with its implication that he only carried it for protection when going outside his own district, and particularly for protection against the Fillmore gang, it was proper on cross-examination to examine Allione about this apparently unprovoked assault upon two sailors. When the witness denied this it was proper to impeach him by showing his prior inconsistent statement to the police. The evidence sought from Allione was independently relevant to contradict one element of the theory developed by appellant in his defense. Being independently relevant, when Allione testified that the incident had not occurred it was proper to impeach this testimony. "In determining whether cross-examination relates to irrelevant matters the test to be applied is, does the question call for a response which might have been proved as an independent fact?" (27 Cal.Jur., Witnesses, § 81, p. 107.) If the subject of inquiry is independently relevant the witness' testimony on cross-examination may be impeached by the proof of prior inconsistent statements. (27 Cal.Jur., Witnesses, § 125, p. 152.)

The jury was properly instructed that this evidence was introduced not as evidence of the facts but solely for the purpose of impeaching the witness.

In one question directed to Allione he was asked whether he remembered appellant and himself "removing some personal property" from the sailors. The witness answered this question in the negative and the officer testified to no such

incident being related to him by the witness. If error was committed in the asking of this particular single question we do not believe that the appellant was prejudiced by it.

What has been said sufficiently disposes of the cross-examination of appellant about an occasion when he exhibited the gun to a young lady and struck her on the wrist with it and the testimony of the young lady in rebuttal concerning this incident. It directly contradicted the evidence of appellant above quoted that he had never pulled the gun on anybody ''aside from this altercation at Edith Apodaca's house.''

The development on cross-examination of the appellant that before he acquired the gun he had carried a knife in a sheath about his leg and the introduction in evidence of the knife and sheath and another knife carried by appellant at the same time was proper on a similar theory. It tended to contradict appellant's testimony that he first thought of the idea of carrying a weapon after his friend had been ''jumped'' by the Fillmore gang and had only escaped through the appearance on the scene of a member of the police force.

A reading of the entire transcript satisfies us that appellant was fairly tried and fairly convicted.

The judgments and order denying appellant's motion for new trial are affirmed.

Nourse, P. J., and Goodell, J., concurred.