[Crim. No. 7383. Second Dist., Div. Three. Mar. 1, 1961.]

THE PEOPLE, Respondent, v. HARVEY MEYERS COLLINS, Appellant.

Ellery E. Cuff, Public Defender, Fred Kilbride and James L. McCormick, Deputy Public Defenders, for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

VALLÉE, J.—By information defendant was accused of the murder of Raymond Whiteside. In a nonjury trial the court found him guilty of voluntary manslaughter and sentenced him to state prison. He appeals from the judgment.

Defendant's contention is that the finding of guilt of manslaughter is unsupported by the evidence and is contrary to law. He asserts the evidence, as a matter of fact and law, is insufficient to prove manslaughter; to the contrary, the evidence establishes a justifiable homicide under Penal Code, section 197. Since we have concluded that defendant's contention is well taken, it is necessary to state all the pertinent evidence.

Raymond Whiteside at the time of his death was living in a room at the Eugene Hotel, 560 Stanford Avenue, Los Angeles. The hotel was owned by Katsuske Shishima. Joseph Poirier lived across the hall from the deceased. Between 6 and 6:30 p. m. on February 24, 1960, a Wednesday, Mr. Poirier saw defendant and Whiteside at the latter's door. Whiteside "was carrying something like a bundle under his arm wrapped in brown paper." Defendant "was carrying a bag. It looked like a jumbo bottle of beer." About 9 a. m. on February 26 Mr. Shishima went to Whiteside's room to clean it. Whiteside was lying on his back, partly across the side of the bed; his feet were on the floor. He was nude below the waist, except his socks were on. His genital organs were exposed. There was blood around his mouth. There were two empty bottles on the bed, one on each side of Whiteside; one of them appeared to be a broken catsup bottle; the other appeared to be an empty jumbo beer bottle. There was another bottle on the floor.

Mr. Poirier, called by the People, testified: The morning of the 26th Mr. Shishima called him and he went into Whiteside's room. He felt Whiteside's wrist; there was no pulse; the body was "real cold."

Donavan Cullings of the Los Angeles Police Department, called by the People, testified: On March 1, 1960, with his partner Officer Hanson present, he had a conversation with defendant. The statements made by defendant were free and voluntary. "I asked the defendant if he knew Raymond Whiteside. He said yes. I asked him if he had a fight with Raymond and he said no. I asked him how Raymond looked when he left after visiting with him Wednesday night, February 24, and he said he was sitting on the bed. That is about the substance of the first conversation." On March 2 he had a second conversation with defendant. The same persons were present. The statements made by defendant were free and voluntary. The conversation, as testified to by Officer Cullings, was as follows: "I asked the defendant if he knew Raymond Whiteside and he said yes. He said, 'I might as well tell you what happened on Wednesday night.' He said, 'I met Raymond on East Fifth Street and told him I was hungry.' Raymond wanted to buy the defendant a drink and defendant said no, he was hungry. Raymond said, 'If you will come up to my room I'll give you something to eat.' They stopped at a liquor store and bought a bottle of wine and a bottle of beer. Raymond carried the bottle of wine and the defendant carried

the bottle of beer. They went to Raymond's room at the Eugene Hotel and the defendant said he didn't have anything to drink, but Raymond drank some wine. The defendant told me that Raymond got undressed, took his pants and shoes off, and then grabbed Mr. Collins, the defendant, and attempted to molest him. Mr. Collins got frightened—he said he was frightened. He grabbed a wine bottle off of the night stand and hit Raymond in the face five or six times; he didn't remember how many times. Mr. Collins said that when Raymond quit struggling he got up off the bed, pulled his pants up, which Raymond had almost pulled off. He got his jacket off of a chair, went out of the room, closing the door. That is about the substance of the second conversation. Q. Did you ask the defendant if he had ever had similar sexual experiences, or any sexual experiences with the deceased in the past? A. Yes, sir, I did. Q. What did he tell you? A. He admitted having sexual relations with Mr. Whiteside on two prior occasions. Q. Was that the gist of your conversation, Officer? A. That is about all of it, sir.''

On cross-examination Officer Cullings testified: ''Q. Did he tell you whether or not on the occasion of the 24th he had been drinking, that is, whether the defendant had been drinking? A. He said he hadn't anything to drink Wednesday night. Q. Did he tell you that he did, however, generally speaking, do considerable drinking? A. Yes. Q. And did he indicate to you that on these prior occasions when he had been with Whiteside whether he had been drinking? A. I don't remember asking him that, sir. Q. You don't remember whether he made a statement clarifying that or not? A. No, sir. Q. When he told you about the prior act or acts, did he indicate to you that the deceased, Whiteside, had orally copulated the defendant's penis? A. No, sir. Q. Did he make it clear to you just what he had done? A. Yes. Q. What did he say he had done? A. He said Raymond made Mr. Collins play the part of the woman and had approached him from the rear, sir. Q. In other words, a violation of Section 286 of the Penal Code, that being the one which denounces sodomy? A. Yes, sir. Q. Did the defendant tell you that he knew how many blows he struck against Whiteside? A. No, sir. Q. Did he tell you that he struck at Whiteside until the hands of Whiteside let go? A. No. He struck at Whiteside until Whiteside's legs relaxed. Whiteside had a scissors grip around his waist with his legs. Q. Did he tell you that he then ceased to strike him?

A. Yes, sir. Q. And that he immediately left the room? A. Yes, sir. Q. Did you ask him why he struck these blows? A. Yes. He said he was afraid of what was going to happen. Q. Did he tell you he was afraid that Whiteside was going to either sodomize him or commit fellatio on him? A. Pardon? Q. Is there a problem about the language I used? A. No. He said he just was afraid of Whiteside. He didn't go into detail. Q. He did not specify? A. No, sir. Q. I'd like to call your attention to your testimony regarding the meeting of the defendant and Whiteside on the street, and as to their conversation regarding possibly feeding the defendant. At the preliminary hearing did you testify to this effect? I'm going to page 38 of the transcript, lines 13 to 16. At the preliminary hearing did you say this—and let me show you the transcript first, Officer. I will ask you to look at page 38 and read lines 11 through 20, if you would, please. A. Out loud? Q. No, just to yourself. A. (Witness reads to himself the portion indicated.) Q. At the time of the preliminary, did you testify as follows: 'I met Ray Wednesday night on Fifth Street and he asked me if I wanted a beer. I told him no, I was hungry, and he said, "Come on up to my room anyway." ' Was that your testimony at that time? A. Yes, sir. Q. Do you feel that that is at all different from your testimony today regarding the conversation on the street? A. No, sir. Q. At the present time, do you recall the defendant telling you that Ray said, 'Come on up to my room anyway'? A. Yes, sir. Q. Did the defendant tell you that from time to time he would borrow small sums of money from his sister, and also that she would give him food? A. Yes, sir. Q. That is in the period before and after February 24? A. Yes, sir. Q. Did you ask the defendant whether he remembered seeing any blood about the body of the deceased? A. I don't recall asking him, no. Q. Do you remember whether he made a statement that he did or didn't recall seeing the blood? A. No. I showed him a picture and he said, 'That is the way Raymond looked when I left.' Q. Did the defendant tell you that he returned to the hotel the following Saturday? A. Yes, sir. Q. And did he tell you that he returned there to tell Mr. Whiteside he was sorry he hit him? A. Yes. Q. Did you arrest the defendant yourself? A. No, sir. Q. To your knowledge, did the defendant leave his name and address with the room clerk at the hotel there on request? A. Yes, sir. . . . THE WITNESS: I have a slip of paper on which he wrote the name and address. Q. BY MR. KILBRIDE: You have the very slip of paper he wrote his name

and address on? A. Yes. . . . Q. Did you yourself ever go to that address? A. Yes, sir. Q. Did you ascertain that it was Collins' address? A. Yes, sir. Q. Would you describe the defendant from your own physical observation of him as a strong, powerful man? A. No, sir. . . . THE COURT: On the day in question when you interviewed him, approximately how much did he weigh? THE WITNESS: Oh, 125 pounds. . . . Q. BY MR. KILBRIDE: Does he appear to be about the same height today as he was when you interviewed him on the 24th? A. Yes, sir. Q. Could you tell us what his height was on the 24th, approximately? A. Oh, five foot five, or so." "Q. Officer Cullings, since you were last on the stand, have you had an opportunity to listen to a portion of the tape? A. Yes. Q. That was the terminal portion of the tape? A. Yes. Q. And do you recall either you or Officer Hanson asking the defendant if he wanted to say anything or ask anything? A. Yes, sir. Q. Then, what did the defendant ask or say at that time? A. He asked us if we thought he was right in defending himself against Mr. Whiteside."

On redirect examination Officer Cullings testified: "Q. In your conversations with the defendant regarding the alleged attack upon him by the deceased Whiteside, the attack was one of sodomy, and that is what he was scared of at that time? A. As I believe, yes, sir. Q. Did you talk to him about their prior relations and what type of relations those were in the past? A. Yes, sir. Q. Were they sodomy or were they oral copulation? A. Sodomy. Q. All sodomy? A. Yes, sir. Q. No oral copulation involved? A. We didn't use those words. He said, 'Whiteside made me play the part of a woman,' and that was what I took that to mean. Q. In other words, he never said 'sodomy'? A. No. He was ashamed—— Q. Did he ever describe their acts, what they were doing? A. No, sir. Q. All he told you was that Whiteside made him take the part of the woman, and then you made this determination of what they were doing from your own conjecture? A. Yes, sir."

On recross-examination Officer Cullings testified: "Q. Just this: He was reluctant to go into details? A. Yes, he was ashamed. We didn't draw it out of him. Q. He never did specify which one it was, whether it was oral copulation or sodomy? A. No, sir."

The report of the autopsy surgeon was received in evidence in lieu of his testimony. The cause of death was tracheo-bronchial aspiration of blood, due to traumatic injuries of face and nose, with fractures and hemorrhage. The report stated

in pertinent part: "HEAD: 1. Lacerations of face. 2. Multiple fractures of right side of face and nose. RESPIRATORY SYSTEM: 1. Tracheobronchial aspiration of blood, severe. 2. Pulmonary congestion and edema. . . . The body is that of a well-developed, well-nourished, middle aged Negro male which appears consistent with the stated age of 41 years. The body has not been embalmed. It measures 72½ inches in length and weighs 158 pounds. . . . No evidence of intrinsic injury is found. . . . The nails are essentially intact except for the left little finger which exhibits a nail growth of 3/32 of an inch and an almost complete recent tear of this nail through ⅔ of its width. There is no evidence of surrounding hemorrhage. . . . Except for several old scars found, the only evidence of recent injury is a vertical reddish scratch abrasion on the anteromedial aspect of the left upper arm."

It was stipulated "that there was an amount of blood removed from the deceased's body and that was submitted to the Toxicology Laboratory for the purpose of determining its ethanol content. That the blood sample was examined by R. J. Abernathy of that laboratory, and that as a result of his scientific examination he returned the opinion that the blood contained 0.21 per cent ethanol content."

Geraldine Lambert was called by the People. It was stipulated she "is an expert regarding blood alcohol examinations and their meanings." She was shown the report of the Toxicology Laboratory and referred to "the words Blood Ethanol: 0.21 per cent." Mrs. Lambert testified that ethanol is the chemical name for ethyl alcohol, which is grain alcohol, and it is grain alcohol that is found in alcoholic beverages such as beer, wine, whiskey, and so on; "Q. A .21 per cent in the body of a 41-year-old man, who measures 72½ inches in length, and weighs approximately 158 pounds, and who drinks liquor or alcoholic beverages generally on the order of at least some a day, what would that represent? A. A .21 per cent in approximately a man weighing 150 pounds—you said the weight was 158 pounds? Q. Yes. [A.] That means that to have this blood alcohol there had been accumulated at the time the sample was taken between 8 and 9 ounces of 100 per cent proof alcohol, or its alcoholic equivalent. There would be between 8 and 9 ounces accumulated at the time the sample was taken, or at the time of death, if death was a factor. Q. What would you determine his state of intoxication to be? A. The same as I have stated before, at least under the influence. Possible intoxication."

The foregoing was all the evidence of the People.

Prior to the trial, on motion of defendant's counsel, the court appointed Dr. Thomas L. Gore to examine defendant under section 1871 of the Code of Civil Procedure. Dr. Gore examined defendant and made his written report to the court. The defense introduced the report in evidence. The report in toto is copied in the footnote.[1] Dr. Gore found that defendant

---

[1] "Pursuant to my appointment by the Court, under Section 1871 of the Code of Civil Procedure, to examine the defendant, I examined him on June 8, 1960. My report thereon is hereby submitted to the Court.

"IDENTIFYING DATA:

"The defendant was examined on June 8, 1960 in the Los Angeles County Jail. He has been charged with the crime of murder, and the defendant pleaded not guilty.

"He was advised of the appointment order and the purpose of this examination. He was further advised that he had the right either to answer questions and give information or to refuse to do so, but that whatever he did was to be reported in full to the appointing judge.

"FAMILY HISTORY:

"This defendant is an Indian of the Wichita Tribe from the vicinity of Anardarko, Oklahoma. The father of this defendant died about 1930 when the defendant was 6 years of age. The age of the father is unknown, and the cause of death is unknown to the defendant. The defendant's mother died in 1955, and the defendant thinks his mother was 43 years of age at the time of her death which was caused by cancer. There is a difficult family relationship to understand in this case. The defendant has three half-brothers whose ages are 21, 13, and 10. The 21-year-old boy has a different mother from the defendant. The two boys, aged 13 and 10, have the same mother as the defendant but a different father. There is also a half-sister, and this half-sister is a full sister to the 21-year old half-brother. The defendant is the oldest of the five children. It is to be understood, of course, that the father had two wives at the same time which is the reason for the older half-brother and half-sister.

"PERSONAL HISTORY:

"The defendant was born November 19, 1934 in Anardarko, Oklahoma and is, therefore, approximately 25½ years of age. The defendant lived in the vicinity of Anardarko, Oklahoma and the nearby little Indian village known as Grace Mount until he was 19 years of age.

"*Education*: The defendant graduated from high school when he was 19 years of age in 1953. Then he went to the Indian school, Haskell Institute, at Lawrence, Kansas, to learn a trade. He remained at Haskell for one year, at which time he entered the military service.

"*Military History*: He entered the United States Marine Corps in October, 1954. His first year in the Marine Corps was spent at Camp Pendleton and also at the base in San Diego. The next two years were spent overseas. The first year overseas was spent in the Philippine Islands at the Marine Corps base and then he had one year in Japan. On completion, he returned to the United States and had his fourth year in the Marine Corps at Camp Pendleton. He was released to inactive duty and furloughed to the Reserve in October, 1958, as he is on an 8-year enlistment before receiving his discharge. When he was released from active duty, he was a private first class. During his Marine service, he had general duty with the Infantry and also with a guard company. While he was in Japan, he was placed on special service and played

was legally sane at the time of the examination on June 8, 1960; that he "was suffering from a panic reaction at the time of the commission of the offense, and his only desire was to escape from the immediate vicinity of the aggressor"; at

---

baseball for about six months. During this period, he weighed approximately 140 pounds and was 5' 6" in height.

"*Arrest Record*: Since his furlough from the Marine Corps to the Reserve in October, 1958, he has lived in the Los Angeles area but has had several periods of jail time. For example, in October, 1958 after his release from military service, he had two arrests for drunkenness. On each one, he was placed on probation and finally in December, 1958, he was arrested for drunkenness and was sentenced to jail. He was released from jail May 11, 1959, and he had his next arrest, according to him, in the middle of November, 1959 but was released at that time. Just after Christmas, 1959, he was again arrested for being drunk and again released. His last arrest, according to the defendant, was on February 29, 1960. This arrest occurred about 7:00 P. M. at Third and Main Streets. He said he was picked up by the police who asked him if he engaged in 'Buggery,' and the defendant told them no. He said the police did not tell him why they arrested him, but the next day he found he was being charged with murder.

"*Drug and Alcohol Usage*: This defendant denies that he has ever used any drugs of any kind such as morphine, cocaine, heroin, and marijuana. He, however, is very frank to admit that he has used alcohol whenever he could get it since his discharge from the Service, and that he also used alcohol when he was in the Service. He said that on two occasions he had Company punishment for his alcoholic proclivities but owing to the fact that his work record was excellent, he was let off without any Company punishment.

"When asked why he did not return to the Marine Corps when he found his difficulties were great in making a suitable adjustment in civilian life, his reply was to the effect that he liked the Marine Corps at first but he felt it was too strict for him, that there were too many regulations and too many people who told him what to do. He felt that if he went back into the Marine Corps he might get into trouble, that he might hit someone who was in authority.

"*Past Medical History*: He has not had any serious injuries, operations, or illnesses.

"*Sexual History*: The defendant admits that he started masturbation when he was about 14 years of age, and he has not quit such activity. In regard to homosexual activities, he states the only person he has ever had homosexual relations with was the victim, Whiteside. Heterosexual contacts were started while he was in the Marine Corps.

"*Present Situation*: This defendant admits that he has had a difficult time with his drinking habit since his release from the Marine Corps and has had considerable time in jail as a result. His work record has been poor.

"He said that sometime around the first part of February, 1960 he was in a bar drinking and there he met Ray Whiteside, a negro man about 42 years of age who was 6' 2" in height and who weighed about 190 pounds. After the two of them did some drinking in the bar, they went to Whiteside's room which was on the top floor of a nearby hotel.

"On the first three occasions that the defendant went to Whiteside's room, there were other guests but the man had alcoholic beverages and some food. On the fourth occasion, the defendant went there specifically to get something to eat as he was hungry. They did some drinking, and the defendant got drunk. Then the victim started playing around with

the time he was mentally ill, but he was not legally insane; with his escape from the aggressor, he recovered from his panic; he "has developed an amnesia for the actual fight due

---

the defendant sexually and eventually orally copulated the defendant. The defendant emphatically denies that he carried out any sexual acts as the aggressor with the victim, and the defendant got out of the room as quickly as he could after the act occurred.

"About one week later, that is, on February 24, 1960, the defendant was hungry, had no money, and so he went around to Whiteside's room about 6:30 P. M. in the hope that Whiteside would give him something to eat. They talked for awhile, as the defendant hoped Whiteside would start cooking. Whiteside had a bottle of wine and also some beer and was drinking, but the defendant was not drinking anything. While there, the defendant was worrying about the next day when he was going to see his half-sister who lives in Los Angeles.

"Finally Whiteside asked him to lie down on the bed and go to sleep. The victim went over to the bed and dropped his trousers and took off his shirt, and then told the defendant, 'You had better do as I am asking you.' With this, the defendant states, he got up and started to leave. As he started to leave the room, Whiteside stood up, grabbed the defendant, and threw him on the bed. The two of them wrestled with Whiteside trying to pull the trousers off of the defendant and get him to acquiesce in sexual play. Finally the defendant got out from beneath Whiteside, reached over and grabbed the wine bottle somehow from off the table. When he got it, he hit Whiteside a slashing blow on the side of the head or of the face. What happened next, the defendant remembers very poorly.

"He felt a relaxation of the hold Whiteside had around the defendant's waist, and he understands that he hit Whiteside several times after this, but the defendant does not recall this. Whiteside released the defendant and rolled over on his back so the defendant could get up. This he did and left the room. He admits that he was greatly afraid that this man Whiteside was going to hurt him, and he did not want to be hurt. He says he did not look at Whiteside to see what condition he was in after he got off the bed. His idea was to get out of the room as fast as possible.

"When he left the room, the defendant went to a mission and got some food and remained there for the service. After the service, he was given a lunch, and he took this lunch and went to his room to eat it.

"The following morning he tried to find a job but could not get one. That night he went to his half-sister's who gave him a sack of groceries, and he went to his room and ate some of it. The next morning he went to the Union Hall, hoping to get a job, but nothing was available. He said he decided on Saturday to go and see Whiteside and ask him not to hold a grudge against him because of their fight, as he was afraid of Whiteside and afraid he might meet him out on the street. He asked the hotel clerk to ring Whiteside's room, and the clerk did but there was no answer. The defendant left and on Sunday, he went to a mission church and got food in the afternoon. Then that night he went to another mission where Indians go, and got some more food.

"MENTAL EXAMINATION:

"As to the general attitude and behavior of this defendant, he was quiet and cooperative. He attempted to give an explanation for his actions during the days in which he was involved with the victim. His stream of talk was logical. His emotional status shows considerable depression and some fear but with the stoicism usually expressed by

to pangs of his conscience since being informed of his crime."
No other evidence was introduced by defendant.

The matter of the sufficiency of the evidence suggests two
questions: First, on the facts as shown by the statement made
by defendant to Officer Cullings, was defendant shown to

---

Indians. There are no abnormal mental trends such as delusions or
hallucinations, and there is no indication that this man is a homosexual.

"His attention and comprehension are good. He was oriented in all
three spheres. His general intelligence is considered average. His
memory for remote and recent events is good except for the period of the
final combat. The loss of memory in this instance is undoubtedly due to
the strong guilt reaction that this man feels regarding the incident. His
insight into his alcoholism and the reasons for it is poor. His judgment
function is disinhibited by the influence of alcohol.

"PHYSICAL EXAMINATION INCLUDING GENERAL NEUROLOGICAL:

"A cursory physical and neurological examination reveals a slim,
dark-haired, stoical Indian with no gross defects physically or neurologi-
cally.

"ANALYSIS:

"We have in this 25½ year old Indian, reared in an Indian village in
central Oklahoma, an individual of Indian culture. When exposed to
alcohol, he loses his judgment function and is unable to control his
appetite for alcohol. This young man had four years of creditable serv-
ice in the Marine Corps with only two periods when he had a reprimand
for drinking. Since his release from the Marine Corps, he has settled in
the Los Angeles area and has had several arrests for drinking and one
period of approximately six months in jail. Owing to his drinking
proclivities, he has been unable to hold a job successfully and, therefore,
has gravitated to the slum section of the city.

"There he met a strong and powerful man who fed him on several
occasions and gave him alcoholic beverages. On the fourth occasion of
their meeting, this man performed a sexual act on the defendant, but the
defendant got away as fast as possible after the act. A few days later
because of his hunger, he returned in the hope that the man would feed
him again. When the victim failed to feed the defendant and the defend-
ant started to leave, the victim started to wrestle with him and to try
to get the defendant to acquiesce to sexual play. As a result of this and
the defendant's fear of the victim, the defendant hit the man Whiteside
on the side of the face with a wine bottle. The defendant left without
realizing the extent of the injuries to the victim.

"After several days of worrying and fear of meeting this man White-
side on the street, the defendant returned to the victim's hotel, hoping
to see him and ask him to forget the fight. Not then at home to the
ring of the hotel clerk, the defendant did not learn until after his arrest
that the man Whiteside had died.

"We find that most of the Indians from this section of Oklahoma are
large and husky individuals. This small and wiry individual joined the
Marine Corps to prove to his friends that he could take it. After four
years when he was released to the Reserve, he realized that the Marine
Corps was not suitable for him. He drifted to Los Angeles, and there
was dependent upon missions and other people such as Whiteside for
food and drink. When he was sexually assaulted by Whiteside on the
fourth visit, he unconsciously was shocked. He made up his mind that
while he might go back, he was not going to be sexually assaulted. The
fear of the sexual assault and of physical pain being produced by this
large man was such as to cause the defendant to utilize any object he
could to free himself from the aggressor. There was no intent to inflict

have been justified in the killing of Whiteside as an act of self-defense? Second, if the conclusion on that proposition is in the affirmative, were any other facts shown (and we have given the gist of all of them) which would furnish ground for the finding of guilt?

Penal Code, section 192, provides: "Manslaughter is the unlawful killing of a human being, without malice. It is of three kinds:

"1. Voluntary—upon a sudden quarrel or heat of passion."

A homicide is justifiable when committed by any person when resisting any attempt to commit a felony upon any person; or, when committed in defense of person against one who manifestly intends or endeavors, by violence or surprise, to commit a felony; or, when committed in the lawful defense of such person when there is reasonable ground to apprehend a design to commit a felony and imminent danger of such design being accomplished. (Pen. Code, § 197; *People* v. *Hatchett,* 63 Cal.App.2d 144, 164 [146 P.2d 469] ; *People* v. *Ranson,* 119 Cal.App.2d 380, 388 [259 P.2d 910].) "A bare fear of the commission of any of the offenses mentioned in subdivisions two and three of the preceding section, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone." (Pen. Code, § 198.)

bodily harm to the extent that it would cause death. In other words, this is the old story of the rabbit and bull dog. Even a rabbit will strike back if cornered.

"DIAGNOSIS:

"SOCIOPATHIC PERSONALITY DISTURBANCE, ALCOHOLISM. Such individuals are ill primarily in terms of society and of conformity with the prevailing cultural milieu.

"FINDINGS AND RECOMMENDATION:

"(1) I find that this defendant was legally sane at the time of the examination and is fully capable of taking part in his defense, understanding the proceedings against him, and cooperating with his attorney.

"(2) I find that this defendant was suffering from a panic reaction at the time of the commission of the offense, and his only desire was to escape from the immediate vicinity of the aggressor. At the time, he was mentally ill, but he was not legally insane. With his escape from the aggressor, he recovered from his panic.

"(3) He has developed an amnesia for the actual fight due to pangs of his conscience since being informed of his crime.

"(4) I recommend that the law proceed upon the merits of the case. The defendant states emphatically that he is through with drinking alcoholic beverages. It is a very well-known fact that Indians have a very low tolerance for alcohol."

588

Lawful resistance to the commission of a public offense may be made by the party about to be injured. (Pen. Code, § 692.) Resistance sufficient to prevent the offense may be made by the party about to be injured to prevent an offense against his person. (Pen. Code, § 693.) "Any necessary force may be used to protect from wrongful injury the person . . ." of oneself. (Civ. Code, § 50.) Where from the nature of the attack a person, as a reasonable man, is justified in believing that his assailant intends to commit a felony upon him, he has a right in defense of his person to use all force necessary to repel the assault; he is not bound to retreat but may stand his ground; and he has a right in defense of his person to repel the assault upon him even to taking the life of his adversary. (*People* v. *Zuckerman,* 56 Cal.App.2d 366, 372-374 [132 P.2d 545] ; *People* v. *Hatchett,* 56 Cal.App.2d 20, 22 [132 P.2d 51].)

 Justification does not depend on the existence of actual danger but on appearances. (*People* v. *Miles,* 55 Cal. 207, 209-210; *People* v. *Hatchett, supra,* 63 Cal.App.2d 144, 164.) In order that a person avail himself of his right of self-defense, it is sufficient that appearances on the part of his assailant were such as to arouse in his mind, as a reasonable man, that his assailant was about to commit a felony. He may act upon such appearances with safety; and if without fault or carelessness he is misled concerning them, and defends himself correctly according to what he supposes the facts to be, his act is justifiable, though the facts were in truth otherwise, and though he was mistaken in his judgment as to such actual necessity at such time and really had no occasion for the use of extreme measures. (*People* v. *Thomson,* 145 Cal. 717, 721 [79 P. 435] ; *People* v. *Hatchett, supra,* 63 Cal.App.2d 144, 156-157.) A person who without fault on his part is exposed to a sudden felonious attack need not retreat. In the exercise of his right of self-defense he may stand his ground and defend himself by the use of all force and means apparently necessary and which would appear to be necessary to a reasonable person in the same situation and with the same knowledge; and he may pursue his assailant until he has secured himself from danger if that course likewise appears reasonably necessary. This rule applies even though the assailed person might more easily have gained safety by flight or by withdrawing from the scene. (*People* v. *Holt,* 25 Cal.2d 59, 63 [153 P.2d 21] ; *People* v. *Carson,* 43

Cal.App.2d 40, 45 [110 P.2d 98]; *People* v. *Ranson, supra,* 119 Cal.App.2d 380, 388.)

Where the peril is swift and imminent and the necessity for action immediate, the law does not weigh in too nice scales the conduct of the assailed and say he shall not be justified in killing because he might have resorted to other means to secure his safety. (*People* v. *Hecker,* 109 Cal. 451, 467 [42 P. 307, 30 L.R.A. 403].)

If the evidence introduced by the People tended to show justification, defendant was not required to introduce again the same evidence in order that he benefit by it. (*People* v. *Wells,* 10 Cal.2d 610, 618 [76 P.2d 493].) If the proof on the part of the prosecution tended to show that the homicide was justifiable, there was no duty on defendant to justify it. (Pen. Code, § 1105; *People* v. *Bannon,* 59 Cal.App. 50, 62 [209 P. 1029]. See *People* v. *Deloney,* 41 Cal.2d 832, 841 [264 P.2d 532].) "The homicide appearing to be justifiable or excusable, the person indicted must, upon his trial, be fully acquitted and discharged." (Pen. Code, § 199.)

Defendant's statement that they bought a bottle of wine and a bottle of beer and that Whiteside carried the wine and he carried the beer is corroborated by the testimony of Mr. Poirier. Defendant said Whiteside "got undressed, took his pants and shoes off." A photograph of Whiteside in evidence corroborates this statement. Whiteside's blood had .21 alcoholic content. He was under the influence of alcohol and possibly intoxicated. He told defendant to lie down on the bed and go to sleep, and "You had better do as I am asking you." Defendant started to leave the room. As he did so, Whiteside grabbed him, threw him on the bed, and pulled his pants almost off. He had a "scissors grip" around defendant's waist with his legs. There was "an almost complete recent tear" of the nail on Whiteside's left little finger through two-thirds of its width and an obvious laceration on his arm. Defendant is a small man; he is about 5 feet, 5 inches tall, and weighs about 125 pounds. Whiteside was a large, powerful man; he was 6 feet, ½ inch tall, and at the time of the autopsy weighed 158 pounds. It is manifest that defendant could not cope with him or defend himself in mere physical combat. The autopsy report shows the injuries were exactly as one would expect them to be from defendant's version of what occurred. Defendant was afraid of "what was going to happen." He was afraid of Whiteside. "[T]he

attack was one of sodomy'' and that was what defendant ''was scared of at that time.'' He grabbed a wine bottle off the night stand and struck Whiteside until the latter ''let go.'' When Whiteside relaxed his legs from around defendant, defendant ''ceased to strike him.'' When Whiteside ''quit struggling,'' defendant ''got up off the bed,'' pulled up his pants, got his jacket off a chair, and ''immediately left the room.''

There was nothing inherently improbable in defendant's account of the affray and no evidence that it occurred in any manner other than that related by him to Officer Cullings. On the contrary, the physical evidence described by Mr. Shishima and depicted in a photograph of the deceased and the room he occupied and the comparative size of the parties tend to corroborate defendant's statements to the officer. On the evidence, defendant was not the aggressor, nor did he enter into the struggle voluntarily, but under circumstances which did not compel him to retreat.

On the evidence there was no previous animosity between defendant and Whiteside. There was no evidence of any motive other than self-defense. There was no evidence of an intent to kill, or of flight, or of anything indicating a consciousness of guilt. Defendant returned to the hotel the following Saturday to tell Whiteside ''he was sorry he hit him,'' and left his true name and address with the room clerk. Defendant asked the officers if they ''thought he was right in defending himself against'' Whiteside. Defendant was not shown to have been the instigator of any difficulty with Whiteside. There are only the statements of defendant with respect to the details of the encounter. In our opinion there is nothing indicated by the statements of defendant to Officer Cullings to warrant the conclusion that defendant, in repelling the attack of Whiteside, acted other than in self-defense. Defendant made no incriminatory statement. As he pictured the encounter, no particular interval of time elapsed between the assault committed by Whiteside until the fatal blow was struck. There was no duty on defendant to retreat under the circumstances. It was not necessary that he should have in words pictured his state of mind as it was at the time of the attack, for under his statement of the encounter the circumstances were such as to indicate nothing else but that by doing what he did he was defending himself against the commission of a felony. The proof of the prosecution showed a case of justification and there is nothing in any

of the other evidence which in anywise tends to contradict or dispute defendant's version of the affair. There was no evidence disproving the claim of self-defense. On the contrary, the only other evidence harmonizes with defendant's version.

The prosecution, having presented as a part of its case the statement of defendant as to how the killing occurred, is bound by that evidence in the absence of proof to the contrary. (*People* v. *Coppla,* 100 Cal.App.2d 766, 769 [224 P.2d 828].) If there be any well-established circumstance which may be reasonably regarded as incompatible with the theory that the killing was justifiable, the trier of fact, from a consideration of all the evidence, is warranted in finding that the act amounted to an unlawful homicide. (*People* v. *Acosta,* 45 Cal.2d 538, 541 [290 P.2d 1].) We find nothing in defendant's statement or in the other evidence which may be reasonably regarded as incompatible with the theory that the killing was justifiable. The fact that on two previous occasions Whiteside had committed sodomy on defendant does not negate the conclusion that the homicide was justifiable. Defendant went to Whiteside's room because he was hungry and Whiteside promised to give him something to eat. On the two previous occasions Whiteside "made" defendant play the part of a woman. There is no evidence with respect to the details of the prior acts: whether defendant consented; whether he was under the influence of liquor; or how long before the night of the homicide the acts took place. On the occasion of the homicide as defendant started to leave, Whiteside grabbed him and attempted by force to accomplish the act. There is nothing in the evidence to indicate that defendant could reasonably anticipate the violent use of force by Whiteside on the occasion in question. In the words of Dr. Gore: "[D]efendant was suffering from a panic reaction at the time of the commission of the offense, and his only desire was to escape from the immediate vicinity of the aggressor."

The facts in *People* v. *Estrada,* 60 Cal.App. 477 [213 P. 67], were similar to those at bar. There the deceased assaulted the defendant. The defendant stabbed him. When he was first questioned by the police the defendant denied any involvement. Later he made a statement to the police describing the entire incident. His statement, like that of defendant here, established a justifiable homicide in self-defense. There was no evidence contradicting the statement. A finding of guilty of manslaughter was reversed. The court said (p. 481):

"In our opinion there is nothing indicated by the narrative as expressed in the statement of the defendant to warrant the conclusion that defendant, in repelling the attack of Murillo, acted other than in necessary self-defense."

The facts in *People* v. *Toledo,* 85 Cal.App.2d 577 [193 P.2d 953], were also similar to those at bar. There the defendant was assaulted by the deceased. A statement of the defendant to the police was introduced in evidence by the People. In a nonjury trial the defendant was convicted of manslaughter. Reversing, the court stated (p. 580) :

"The right of necessary self-defense, long recognized and protected by the law, obviously deals with an emergency situation in which a certain degree of elasticity is essential if the defense is to be of any practical value to the person assaulted. . . .

"[P. 581.] In the instant case, as appellant's brief asserts, 'the record is silent of any evidence to bring home to the defendant any violent act committed by him toward the deceased,' other than that done in repelling the knife assault of the deceased. 'Unless,' as appellant says, 'we arbitrarily see fit to believe only those words of the defendant's statement and testimony wherein he acknowledges striking the decedent and disbelieve all the rest of his statement and testimony and further disbelieve the testimony of other witnesses as to the circumstances leading up to the blows being struck by Toledo, it cannot be determined that a criminal homicide was committed. The prosecution having presented as a part of its case the statement of the defendant which justified the homicide is bound by that evidence in the absence of proof to the contrary.'

"In this connection may be noted the case of *People* v. *Salaz,* 66 Cal.App. 173, 181 [225 P. 777], where the court said: 'The jury could not have found, from the evidence for the people, that the killing was done by appellant except upon the latter's admissions, which carried, in close and immediate connection with proof of the killing, circumstances of necessary self-defense. . . . No presumption of guilt weighed against the presumption of innocence.' "

Under the evidence, the acts of Whiteside gave defendant reasonable grounds to believe that Whiteside was about to commit a felony (Pen. Code, § 286), and that there was imminent danger of its being accomplished. We hold the evi-

dence establishes as a matter of law that the homicide was justifiable.

Reversed.

Shinn, P. J., and Ford, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied April 26, 1961. Schauer, J., was of the opinion that the petition should be granted.