THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JOSÉ A. DE JESÚS SANTANA, Defendant and Appellant.

No. CR-71-110. Decided September 13, 1972.

790

*Nicolás Torres Marrero* and *Manuel García Marrero* for appellant. *Gilberto Gierbolini, Solicitor General,* and *Bienvenido Vélez Coello, Assistant Solicitor General,* for The People.

MR. JUSTICE MARTÍN delivered the opinion of the Court.

Appellant José Antonio de Jesús Santana was accused jointly with his brother Roberto de Jesús Santana of the

crime of murder in the first degree for having caused the death of the human being Sixto Torres Declet, and for violations of §§ 6 and 8 of the Weapons Law. Roberto was peremptorily acquitted. Appellant was found guilty by the court of the crime of voluntary manslaughter and of the cited violations of the Weapons Law. He was sentenced to serve from 2 to 8 years for the crime of voluntary manslaughter, and concurrently with said term: from 1 to 3 years for the violation of § 8 of the Weapons Law and 6 months for the violation of § 6 of said law. Feeling aggrieved by the verdict and the sentence pronounced in the case of voluntary manslaughter, the defendant filed an appeal in this Court.

It is assigned as the only error that the trial court erred upon finding appellant guilty of voluntary manslaughter in the absence of sufficient evidence to justify the verdict rendered. As part of the error, it is assigned that the defense proved a case of self-defense.

For the disposition of this assignment, it is indispensable for us to make a recount of the evidence introduced.

The witness José Colón Rivera testified, insofar as pertinent, that he was the owner of the business where the facts occurred; that on December 4, 1967, at noon, at about 12:30, there were several persons having lunch at his business located in a rural zone, while others who had already lunched played billiard; that he saw Don Vive, appellant's father, outside the business; that he heard a noise (*escarceo*) outside the business and saw appellant's father, through the door on the front of the business, moving from one side to the other; that simultaneously three detonations which came from the exterior of the business were heard; and that immediately thereafter he saw, from the interior of the business, the victim Sixto Torres come in running through the left door of the business and afterwards go out through the right door, reentering through the left, and collapsing then on the floor at the entrance of said left door; that appellant went

behind the victim, while the latter was running, with "a black thing" of about four and one-fourth inches; that he could not determine if it was a revolver; that several persons picked up the victim and took him to the hospital in an automobile; that when the wounded person left, he found a knife stained with blood at the bottom of a chair that was near the place where the victim passed running inside the establishment; that afterwards he remembered that said knife belonged to the victim since he had seen him on a previous occasion peeling an orange; and that subsequent to the incident narrated he saw that Don Vive had a wound on the right part of the neck and another on the head and that blood spurted from said wounds.

Witness Adelaido Vázquez testified, insofar as pertinent, that about twelve fifteen in the afternoon of the events, he was playing at a billiard table when about four shots were heard; that everybody ran and he did not know what to do; that he saw when the victim entered running into the establishment; that the latter dragged the chairs and the table where there were people eating; that he went out through the other door, and that upon reentering through the left door he collapsed; that when the victim collapsed he approached him, raised his shirt, and saw a bullet coming out of the stomach; and that at that moment he saw appellant with a pistol in the hand trying to introduce or take out of it a clip of bullets.

The policeman, Roberto Feliciano, testified insofar as pertinent: that he knew the defendants since they were children; that on the date of the events he saw the defendants at his house, that they came asking for Feliciano's father who was away; that there he noticed that the defendants' father had a wound on the neck but that he did not notice very well how it was and that it was not bleeding much; that afterwards he went out with the defendant brothers and upon passing in front of José Colón's business they saw a

group of persons, appellant then telling him what had happened; that he took them to the police station and returned with the judge to the scene of the crime where he found some bullet caps which he gave to the judge; and that there he observed that defendants' father showed something on the head like a scratch or a small bump.

Dr. José Antonio Caro testified having performed the autopsy on the deceased. He stated that in his opinion the death was produced by a hemorrhage caused by two projectile wounds—one in the abdomen and another in the arm. He identified a .22 caliber projectile which he extracted from the stomach of the deceased.

Ángel de Jesús, known as Don Vive, father of the defendants, testified, insofar as pertinent: that on the day of the facts, when he was going to leave José Colón's business, he met the victim; that they talked in relation to an incident which had occurred the night before where the witness had intervened in a discussion between the victim and a person named Luis Sánchez; that immediately the victim insulted the witness with words and attacked him with a knife giving him "several cuts," that he felt wounded and heard some shots; that he was wounded on the neck and on the head, for which reason they took two stitches. He identified the knife introduced in evidence as the one the victim had in his hand and with which the latter attacked him. He also said that he did not know who fired the shots.

Appellant, José Antonio de Jesús Santana, himself, testified: that on the day of the events he was outside José Colón's business talking with some friends; that he knew the victim because both were residents of the same ward; that he saw the victim come to the business and heard when his father told the victim that the incident of the night before had no sense. He also testified that the victim said some words to his father and attacked him with a knife some eight or ten times; that upon seeing his father wounded and since the

victim was a dangerous man he fired at him; that he knew of his dangerousness because on an occasion he had mutilated a veteran.[1] To questions of the judge he testified that he did not remember for how long he had had the pistol, nor how it got to his hands. He said, nevertheless, that that day he had it on him because he had come from the farm where he always carried it.

In addition to the oral evidence formerly described, the prosecuting attorney presented a deposition taken before the judge from the victim's brother where the deponent, who was in the United States at the time of the trial, indicated that the codefendant Roberto de Jesús had fired with another pistol. The trial judge did not give credit to the same because it was contradictory and incredible and he thus stated in open court upon acquitting said codefendant, Roberto de Jesús. An examination of said deposition affirms us that the weighing made by the trial judge is correct.

Appellant accepted in his testimony that he had fired the shots which caused the death of the victim. The only substantial question, then, that the appeal under consideration raises is whether appellant acted in defense of another upon killing the victim. If it had been so, the homicide can be justifiable pursuant to the provisions of § 209 of the Penal Code (33 L.P.R.A. § 641),[2] and more specifically if upon

---

[1] The defense introduced in evidence the records of two convictions against the victim for a violation of § 4 of the Weapons Law and for the crime of mayhem, respectively.

[2] Section 209 provides:
"Homicide is also justifiable when committed by any person in any of the following cases:

"1. When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person; or,

"2. When committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a, violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein; or,

"3. When committed in the lawful defense of such person, or of a

so acting he was justified in killing the aggressor of his father in order to avoid that the former would cause great bodily harm to the latter.

 It has been held that a person has a right to use violence in defense of another only when the imperiled person would have been justified in using it in his own defense. *People* v. *Knight*, 72 P.R.R. 106, 112 (1951). Likewise, the right to justify killing in defense of a third person depends upon the same conditions as would be necessary to excuse the third person under the plea of self-defense. 1 Wharton's *Criminal Law and Procedure*, § 219; *State* v. *Hennessy*, 90 P. 221; *White* v. *Commonwealth*, 333 S.W.2d 521; *People* v. *Forte*, 110 N.E. 47. For that reason, the principles of self-defense are likewise applicable to cases of homicide in defense of the person of another. *People* v. *Roe*, 189 Cal. 548; *People* v. *Ortiz*, 63 Cal. App. 662; see Fricke and Alarcón, *California Criminal Law* 180, 10th ed.

██ In order that a defendant may allege successfully the doctrine of self-defense, he must show that he had reasonable grounds for believing that he was in imminent danger of losing his life or receiving great bodily harm and that he did not cause more damage than was necessary for his defense. *People* v. *Ríos Rivera*, 88 P.R.R. 160 (1963); *People* v. *Lozada*, 37 P.R.R. 860 (1928). The slayer, nevertheless, should have used all the means available to him, consistent with his safety, in order to avoid injuries or to have to kill

---

wife or husband, parent, child, master, mistress, or servant of such person, when there is reasonable ground to apprehend a design to commit a felony, or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he was the assailant or engaged in mortal combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed; or

"4. When necessarily committed in attempting by lawful ways and means to apprehend any person for any felony committed or in lawfully suppressing any riot, or in lawfully keeping and preserving the peace."

another person in self-defense. *People* v. *Román Marrero*, 96 P.R.R. 777, 783 (1968).

It is indispensable moreover, that the circumstances relied on to justify self-defense must be sufficient to excite the fears of a reasonable person. *People* v. *Morales*, 45 P.R.R. 185 (1933) ; *People* v. *Ríos Rivera, supra.* This is why the function of the trier in these cases in the determination as to whether a reasonable person in defendant's position, knowing what he knew and seeing what he saw, believes it necessary to kill the aggressor to prevent injury, gains importance. *People* v. *Head,* 288 P. 106. Furthermore, it is a rule of self-defense that the person attacked is not bound to retreat until finding himself in a retreat to the wall position before attacking his aggressor as was maintained in the old common law. *People* v. *Iturrino de Jesús,* 90 P.R.R. 687 (1964) ; *People* v. *Díaz Alicea,* 91 P.R.R. 763 (1965). Inclusively, the person attacked, besides gaining his defense, may pursue his adversary if that course of action is indispensable in order to save his life. *People* v. *Kinowaki,* 39 Cal. App.2d 376; *People* v. *Campanella,* 39 Cal. App.2d 384; *People* v. *Hatchett,* 56 Cal. App.2d 20.

In California, where the provisions of the Penal Code as to self-defense are similar to ours, it has been held that one may slay his assailant if the person attacked is placed under circumstances sufficient to excite the fears of a reasonable person that another designs to commit great bodily injury and to afford grounds for belief of imminent danger. *People* v. *Mercer,* 210 Cal. App.2d 153; *People* v. *Ranson,* 119 Cal. App.2d 380. Where the peril is swift and imminent, and the necessity for action immediate, although the conduct of the assailed can well be one of a reasonable person, said conduct cannot be weighed in too nice scales. *People* v. *Mercer, supra; People* v. *Collins,* 189 Cal. App.2d 575; *People* v. *Hecker,* 109 Cal. 451, 42 P. 307. Naturally, if the danger ceases, the aggression is not justified, *People* v.

*Ríos Rivera, supra; People* v. *Lozada, supra;* but while the danger subsists the person attacked can attack his aggressor for the purpose of gaining his safety. *People* v. *Kinowaki, supra; People* v. *Campanella, supra.*

With these rules as basis let us see the circumstances of the case at bar. We are facing a singular situation where only the witnesses for the defense, namely, the defendant and his father, can give an exact version of what happened outside the business. The other witnesses who testified as to the incident were inside the business, and their observation as to what in effect happened outside the establishment was extremely limited. The version which arises from the evidence for the defense was to the effect that the victim, who allegedly was a dangerous man, attacked defendant's father with a folding knife wounding him on the head and on the neck. In seeing his father wounded, and while the victim continued attacking the former with the folding knife, the defendant fired at him three or four times in a rapid and successive manner. There is no evidence whatsoever that the shots occurred while the victim was fleeing, and on the contrary, the evidence is to the effect that appellant did not fire during the former's flight.

Appellant's version is not illogical, nor contradictory, nor was it rebutted in any aspect. Even more, from the very evidence of the People there arise elements which corroborate in part the same. The noise (*escarceo*) which the owner of the business heard moments before the shots outside the business and the fact of having seen from the interior of the business (from where his visual field was limited to what he could see through two exterior doors of the establishment) defendant's father moving from one side to the other, and having observed a few moments after the events defendant's father with some wounds, and having found the knife of the victim stained with blood on a chair which was on the path along which the victim passed running, although he did not see the latter attack

defendant's father, are circumstances which the court should have considered on elucidating the evidence and which certainly corroborate the testimonies of the defense.

The evidence for the defense, which was not challenged nor controverted by that of the People, reveals the manner in which the happenings unfolded and gives us ground for concluding that appellant acted under the influence of the fear of a reasonable person who is encountered with the imminent danger in which his father was upon being submitted to a sudden, dangerous, and constant attack with a cutting weapon which was evidently directed towards the neck and the head, and that as a matter of fact he was reached and wounded by the aggressor. Logically such situation made appellant fear that the uninterrupted aggression on the part of the victim could deprive his father from life without having time to prevent it. The knowledge which he had of the victim's bad character and dangerousness aggravated even more appellant's apprehension.[3] Under such circumstances and the action having happened in such short instances when a hesitation could result in a disgrace, justification may be found in the defensive act of a son, who upon witnessing the events and feeling unable to resort effectively to other means, becomes obligated to use the last resort which was then available to him in order to put an end to a dangerous situation.

In the case at bar the persecution of the victim by appellant after the shots did not really have consequences, since it arises from the evidence that appellant did not fire additional shots while pursuing the victim.

Our Rule 157 of the Rules of Criminal Procedure provides that the defendant has the burden of proving cir-

---

[3] The evidence as to the victim's bad reputation and dangerous character is admissible in a case where self-defense is alleged to establish the reasonableness of appellant's fear at the time of the homicide, as well as to corroborate the evidence as to the victim's conduct which gave rise to the homicide. *Morales Torres* v. *Superior Court*, 99 P.R.R. 446 (1970).

cumstances of mitigation which excuse or justify the fact of the death once it is proven that he caused the death. Nevertheless, said rule cannot affect the presumption of innocence of the defendant even though the illegal death has been established, for which reason it does not impose the obligation of establishing with preponderant evidence the justifying or exempting elements of the crime. The only evidence required from the defendant is that which raises a reasonable doubt as to his guilt. Such construction is permeated by the constitutional provision which establishes the presumption of innocence which accompanies the defendant throughout all the criminal prosecution. Constitution of Puerto Rico, Art. II, § 11.

In *People* v. *Túa*, 84 P.R.R. 37 (1961), although it was of a case of murder in which the justification of the same was not alleged, we had the opportunity of construing § 247 of the Code of Criminal Procedure, today Rule 157 of the Rules of Criminal Procedure, in relation to the degree of evidence which the defendant should introduce to prove that circumstances of mitigation which would either excuse or justify the fact of the death have intervened. We decided there that: "the defendant is presumed to be innocent as to every essential element of the offense and the burden of proof does not change at any stage of the proceeding." Consequently, we stated that the defendant "would only be bound to introduce such evidence as will establish a reasonable doubt on his guilt."

In the instant case, although it is true that some circumstances have maintained themselves in darkness as to the justification, we understand that the evidence for the defense established a reasonable doubt as to the existence of justifiable elements of the crime. The version of the facts presented by the defense, which was not rebutted by the evidence of the People, but on the contrary was corroborated in part by the latter, united to the fact that only the wit-

nesses for the defense gave a logic version of the happenings, moves us to conclude that there existed reasonable doubt as to defendant's guilt concerning the homicide. Said doubt should be decided in his favor.

The sentence appealed from in this case for the crime of voluntary manslaughter will be reversed.

Mr. Chief Justice Negrón Fernández took no part in the decision of this case. Mr. Justice Martínez Muñoz dissented.