Filed 8/26/13  P. v. Sanders CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055974 |
| v. | (Super.Ct.No. FSB804013) |
| JODIE JAMES SANDERS, JR., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Harold T. Wilson, Jr., Judge.  Affirmed.

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton, and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

1

I

INTRODUCTION

Defendant Jodie James Sanders provided services for privately-owned Automatic Teller Machines (ATMs). During a dispute about thefts from the ATMs, defendant shot and killed Robert Jackson.

A jury convicted defendant of three counts of grand theft in violation of Penal Code section 487,[1] and one count of second degree murder with true findings on the allegations of personal discharge of a firearm causing death. (§§ 187, subd. (a), and 12022.53, subds. (b), (c), and (d).)

The court sentenced defendant to an indeterminate term of 15 years to life for the second degree murder plus 25 years to life for the gun-use enhancement. The court sentenced defendant to an additional consecutive term of four years and four months for the three theft offenses. Defendant's total sentence is 40 years to life and four years and four months.[2]

On appeal, defendant challenges the second degree murder conviction but not the three theft convictions. We reject defendant's sole contention on appeal that it was not proved "beyond a reasonable doubt" that defendant shot Jackson "Based On An

---

[1] All statutory references are to the Penal Code unless stated otherwise.

[2] Defendant turns 70 in December 2013, and is in poor health with diabetes, cataracts, and retinopathy. He has undergone triple bypass surgery since being incarcerated.

2

Unreasonable Belief He Needed to Defend Himself Against Imminent Deadly Force."

We affirm the judgment.

## II

## STATEMENT OF FACTS

A. *The ATM Thefts*

Because defendant does not contest his theft convictions, we briefly summarize that evidence. The three ATM owners were the victim, Jackson, Ed Killgore, and Nazir Jivani. Defendant and Jackson both serviced the ATMs, refilling the machines with cash as necessary. Defendant and Jackson had the ATM keys and codes. As a general practice, each servicer individually recorded the amount of cash he put in the ATM without a second person verifying the actual amount.

Killgore testified that, in May 2008, $50,000 was missing from his ATMs and $54,000 was missing from Jackson's ATMs. Defendant explained variously that the money had been moved to other machines, $20,000 had been stolen from defendant's vehicle, and defendant took the money.

National Link processed ATM transactions. Sam Kandah, the president of National Link, testified he had known and worked with defendant for about 15 years. Defendant borrowed money from Kandah to pay back the missing ATM money. Kandah knew defendant was attempting to repay the missing money while continuing to provide services for Jackson and Killgore's ATM machines.

According to Killgore, for several months after May 2008, no one reported the missing money to the police or an insurance company. Instead, Killgore, Jackson,

3

defendant, and defendant's son, Jodie, Jr., tried to negotiate a private repayment plan to repay $70,000 to Killgore and Jackson. Jodie, Jr. offered to cash in his 401K to repay the missing money.

On September 26, 2008, Jivani discovered his ATMs were missing about $26,000 in total. Jivani called the sheriff's department.

On September 30, 2008, Jackson called Killgore and told him defendant wanted to give them $40,000 in cash that day instead of the previously proposed repayment plan. Jackson agreed to meet defendant. Killgore recommended Jackson not meet defendant because defendant's son had already agreed to repay $70,000. After Killgore found out the next day that Jackson had been killed, he reported the missing money to the police.

B. *The Shooting of Jackson*

On September 30, 2008, defendant met Jackson in the Jack-in-the-Box restaurant parking lot at the intersection of Del Rosa and Highland Avenues in San Bernardino.

One witness, Nathaniel Blount, watched events from his vehicle as he sat in the parking lot about 20 or 30 yards away. Defendant arrived first, about 6:30 p.m. He was talking on his cell phone and had a briefcase in his hand when he first got out of his vehicle. He then placed the briefcase back inside his minivan and stood outside as though waiting for someone.

Jackson pulled into the parking lot into a space facing defendant's vehicle, got out of his car, and placed an envelope on the hood of his sedan. Onlookers described the two men as looking "really upset," and arguing with each other for more than five minutes. When Jackson walked around to the driver's side of his vehicle, defendant went to his

4

van, and pulled out his briefcase containing a gun. According to Blount, when Jackson tried to run, defendant shot him in the back three times. The two men were about two to three feet away from each other at the time the shots were fired. After the shooting, Jackson was lying face up near the driver's side of his vehicle.

Blount did not see Jackson with any kind of weapon, nor did he see him put his hand in his pockets or try to have any physical contact with defendant. One witness told police he heard three shots, then saw defendant fire two more shots into Jackson's chest. Another witness testified the two men were conversing casually for a couple of minutes. One person heard one gunshot, looked up, then saw defendant pointing his arm toward the ground and heard three or four more shots. Blount saw defendant return the gun to the briefcase, replace the briefcase in the van, and make a call to 911. Defendant stood calmly by his car while waiting for police to arrive. Defendant was arrested without incident.

Defendant shot Jackson five times. At the scene, officers found five expended casings from a semiautomatic handgun in the parking lot. The gun was inside a case on the driver's seat in defendant's minivan. The gun clip was empty but there was one live round in the chamber. Paperwork inside the van indicated defendant purchased the gun in August 2008 and picked it up in September 2008.

On the hood of Jackson's car, officers found various documents in a folder, including a typed agreement concerning a dispute over money between defendant, Jackson, and Killgore, with a plan for repayment. Jackson did not have a weapon.

5

*C. Defendant's Statements*

Defendant's recorded statements to police were played for the jury. Defendant seemed calm and coherent when speaking to Sergeant Higgins.

On the day of the shooting, Jackson asked Jodie Jr. to meet with him alone. Defendant left Jackson a message saying he wanted to attend any meeting. Defendant's wife was listening when Jackson called back and threatened to kill defendant. Defendant overheard Jackson's "live-in" tell him not to call defendant names or to threaten him. Defendant's wife urged him not to meet Jackson. Jodie Jr. did not want his father to go because defendant told him Jackson had threatened to kill him.

After defendant took his wife to a casino, Jackson called and asked to meet at the Jack-in-the-Box in Lytle Creek, ranting, "[Y]ou stole my god damn money, you stole my damn money" and again threatening to kill him. Defendant got his gun, loaded it, and drove over to meet Jackson but they missed one another and defendant went home.

In another telephone call, Jackson threatened defendant's life again, saying it would be worth losing the money to see defendant's brains "blown out" and calling defendant a racial slur. Defendant agreed to meet Jackson at another Jack-in-the-Box on Del Rosa. While defendant waited for Jackson to show up, Jodie, Jr. called and defendant told him he was afraid Jackson would shoot him.

When Jackson arrived at the Jack-in-the-Box, the men disagreed on the amount of money defendant owed Jackson. Jackson wanted defendant to sign an agreement promising to pay him $72,000 by December 31. Both men returned to their cars and defendant got his briefcase with the loaded gun, "just being cautious . . . ."

6

Jackson had threatened defendant three times that day. Jackson repeated he would blow Sanders' brains out and would enjoy putting a bullet through defendant. Jackson reached for his pocket, taunting, "you don't think I will do you, you don't think I will do you." Defendant pulled out his gun, shooting Jackson twice in the front and, when Jackson turned around, shooting him once in the back. Defendant thought he fired two or three times. He then called 911 and waited for the police.

## D. Post-Shooting

Jackson died from the gunshot wounds caused by two bullets entering Jackson's body from the front through his chest and lower rib cage area, damaging his heart and bowel. Three bullets entered Jackson's body from the rear through his shoulder and mid-back area, damaging major organs, including his lung, stomach, and liver. He was lying on his back after the shooting. The final shot to Jackson's heart was the fatal wound.

## E. Defense Evidence

Jackson's wife testified that Jackson trusted defendant until the money was missing. As a favor to Jodie Jr., Jackson agreed defendant could repay the money. She never heard her husband threaten defendant although she heard her husband tell defendant he was a thief and a liar and belonged in jail.

Jodie Jr. testified defendant was trying to repay Jackson's money. In April 2008, defendant attempted suicide and was in the VA hospital in a locked down facility. Jackson visited defendant in the hospital. Defendant continued to work for Jackson but the relationship deteriorated between May and September 2008. Jodie Jr. heard Jackson yell and scream at defendant but he did not hear Jackson threaten defendant. Defendant

7

did not raise his voice or argue with Jackson. He was ashamed about losing the money. Jodie Jr. agreed to sell his mobile home to try to pay Jackson back. Jodie Jr. also discussed giving Jackson the money out of his retirement plan if selling the mobile home did not work.

Defendant's wife testified Jackson's attitude toward defendant changed following defendant's suicide attempt. Jackson was angry and yelled at defendant on numerous occasions. On September 30, 2008, she overheard the men on the phone when Jackson threatened to blow defendant's brains out. She wanted defendant to call the police. She did not know defendant had bought a gun or that he was going to meet Jackson after she went to the casino.

Dr. Kania, an expert in clinical psychology, testified regarding a human's physiological responses to threats. Humans either run away or fight during stressful situations. The "fight or flight" defense mechanism includes a huge adrenaline rush to the body, and other immediate emotional bodily reactions. The physiological reactions occur within seconds and do not dissipate until the danger is no longer perceived. The more threatening a situation, the more adrenaline delays one's ability to think rationally. Procuring an accessible weapon means one is thinking rather than simply reacting.

*F. Defendant's Testimony*

Defendant testified in his own defense that he met Jackson through a mutual friend, Jim Moller, in 1999. Defendant began helping Moller service his 10 ATMs. After Moller was murdered in 2002, defendant helped Jackson work out a deal with Moller's heirs to buy the ATMs. Jackson promised to make defendant a one-third

8

partner, receiving no profits for at least five years. Killgore also joined the partnership and defendant serviced Killgore's ATMs.

In February 2007, $27,000 was stolen from defendant's car and defendant tried to conceal the loss. Defendant began entering false information into some of Killgore and Jackson's ATMs. Defendant decided to hide the missing money from Jackson until the partnership was confirmed on the five-year anniversary of their partnership agreement. Because it was hard to "shuffle" the money around, defendant borrowed $20,000 from Kandah in May 2007 and used it to fill the machines.

In April 2008, Jackson found out about the missing money. Defendant had asked Jackson to make him a partner but Jackson refused, saying he had thought defendant would die sooner. Jackson told defendant to stop servicing the ATMs and to repay the money by May 1, 2008 or be arrested. Jackson used a racial slur to describe defendant.

Defendant attempted to kill himself with sleeping pills and diabetes medicine and was in the VA Hospital in April 2008. When Jackson visited defendant in the hospital, he said that Killgore's machines were "light" and that he, Jackson, had adjusted them, by which defendant assumed Jackson had taken a portion of the missing $27,000. Defendant denied taking money from Killgore's machines. Killgore, Jackson, and defendant all had keys and codes to Killgore's machines. After his release, defendant serviced Jackson's machines for another month.

In July 2008, Jackson gave defendant a copy of a document indicating defendant had stolen $108,000. Defendant believed there was only $39,000 missing. Jackson

yelled and screamed at defendant every time they spoke from July through September 2008. Jackson proposed different ways for defendant to commit suicide.

Defendant bought the gun because Jackson had threatened him and because he was contemplating suicide again. He also wanted to protect himself while servicing ATMs. He kept the gun underneath his bed and the ammunition was in the car. He practiced shooting the gun after he bought it and had it repaired in mid-September.

During a telephone call on September 30, Jackson threatened both defendant and his wife, to "blow both of your 'F'ing brains out." Defendant's wife wanted him to call the police.

Defendant thought Jackson was going to try to kill him so he armed himself for their meeting. After Jackson failed to show at the first location, they met at the second Jack-in-the-Box about two blocks from Jackson's house. Defendant waited for Jackson to park. Jackson left his car and placed a blue document on the hood. Defendant walked over and read the agreement and told Jackson he disagreed with the amount owed, which he thought should be $47,000. Jackson began yelling that defendant would sign it or he would blow his brains out. Defendant retrieved the briefcase and gun from his car and told Jackson he could "take that agreement and stick it. I'm not signing a damn thing." Jackson persisted and reached in his pocket. Defendant pulled the gun out and shot Jackson once in the stomach. When Jackson kept yelling with his hand still in his pocket, defendant fired a second shot a little higher. Jackson turned and ran. Defendant fired a third shot into Jackson's back. At that point, everything went blank. Defendant fired

10

more shots after the first and second shots because he thought Jackson was going to hide behind a truck.

Defendant feared he would be killed when Jackson put his hand in his pocket and told defendant to sign the agreement. Defendant did not come to the meeting intending to kill Jackson. Defendant denied being angry at Jackson because he had accused defendant of stealing or because Jackson threatened him.

Defendant denied taking any money from Jivani's machines but admitted entering false information into the registers to make it appear as if they contained more cash than they did.

III

UNREASONABLE BELIEF IN SELF-DEFENSE

Defendant argues the prosecution failed to meet its burden to prove murder rather than voluntary manslaughter by establishing beyond a reasonable doubt that defendant did not "unreasonably believe" he needed to act to defend himself.

When a defendant challenges the sufficiency of the evidence for a conviction, an appellate court reviews "the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible and of solid value – from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 317-320; *People v. Johnson* (1980) 26 Cal.3d 557, 578.) If the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. (*People v.*

11

*Ochoa* (1993) 6 Cal.4th 1199, 1206.)" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.) We focus on the whole record rather than on "isolated bits of evidence." (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1203.)

If a defendant is charged with murder and the evidence raises the issue whether the killing could support a verdict of voluntary manslaughter or not guilty, the prosecutor must prove beyond a reasonable doubt the killing was not mitigated or justified. (§ 189.5; *People v. Adrian* (1982) 135 Cal.App.3d 335, 339-340.) Here, the prosecutor was required to prove defendant did not actually believe he needed to defend himself, even if that belief was not reasonable. (See *In re Christian S.* (1994) 7 Cal.4th 768, 771; *People v. Banks* (1976) 67 Cal.App.3d 379, 383-384.)

Based on CALCRIM No. 517, the jury was instructed:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense.

"If you conclude the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable.

"The defendant acted in imperfect self-defense if:

"1. The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury;

"AND

12

"2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger;

"BUT

"3. At least one of those beliefs was unreasonable.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.

"In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.

"If you find that Robert Jackson threatened or harmed the defendant in the past, you may consider that information in evaluating the defendant's beliefs.

"*Great bodily injury* means significant of substantial physical injury. It is an injury that is greater than minor or moderate harm.

"The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. If the People have not met this burden, you must find the defendant not guilty of murder."

Defendant claims he acted in self-defense, believing Jackson was going to kill him based on Jackson's past threats, including the series of threats made on the day of the shooting. A summary of defendant's argument is as follows. Defendant contends the evidence demonstrates that, after Jackson threatened him throughout the day and attempted to force him to sign an agreement to repay the missing money, defendant acted out of an unreasonable belief that Jackson was reaching for a gun to kill him.

13

Defendant maintains he had a right to protect himself from Jackson whom he claims had repeatedly threatened his life over several months. Contrary to the prosecutor's suggestion, owning a handgun or bringing it to the meeting did not make defendant a criminal or a gang member. Even if Jackson was running away from defendant when he fired, as Blount testified, it did not show defendant lacked an unreasonable belief in the need to defend himself. The psychologist's testimony showed defendant could have been reacting to perceived danger rather than thinking coherently and clearly. The right to defend oneself or others does not end when someone who apparently has a gun starts running away. The right to defend includes the right to repel an assault. (*People v. Collins* (1961) 189 Cal.App.2d 575, 588.) Because the prosecution's evidence at trial failed to show defendant did not believe he needed to defend himself against imminent danger, the second degree murder conviction cannot stand. Due process requires reversal. (U.S. Const., Amends. 5 & 14; Cal. Const., art. 1, sec. 15; *In re Winship* (1970) 397 U.S. 358, 364; *Jackson v. Virginia, supra*, 443 U.S. at p. 314; *People v. Johnson, supra*, 26 Cal.3d at p. 578.)

We disagree with defendant's assessment of the evidence because he relies on favorable evidence and inferences and fails to acknowledge reasonable contrary evidence and inferences supporting the jury's verdict. (*People v. Johnson*, *supra,* 26 Cal.3d at p. 578; *People v. Bean* (1988) 46 Cal.3d 919, 932 [same standard for circumstantial evidence].) Even if the reviewing court determines the evidence could reasonably be reconciled with a contrary finding, it does not warrant a reversal of the judgment. (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.) The conviction shall stand "unless it

14

appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Cravens* (2012) 53 Cal.4th 500, 507-508.)

Here the evidence presented a classic credibility call for the jury. The prosecution evidence supported a finding that defendant acted with malice aforethought in killing Jackson. After admitting he stole from the ATMs, defendant forced a meeting with Jackson to settle the settlement restitution for a lesser amount. When the men argued and Jackson insisted on a greater amount than that offered by defendant, defendant refused and shot him multiple times with the gun he was carrying. Blount also testified that Jackson never put his hands in his pockets. Jackson had no weapon, meaning he had no reason to reach into his pocket in response to defendant producing a gun. From the autopsy evidence, the jury could reasonably find defendant shot Jackson three times in the back as Jackson was fleeing and twice in the abdomen and chest. The evidence fully supported a finding of malice aforethought and provided no evidence to support a claim of unreasonable self-defense.

In contrast, defendant claimed that he attended the meeting at Jackson's insistence despite repeated threats of death by Jackson and—when Jackson made his final threat and reached into his pocket—defendant fired in fear that Jackson was about to kill him.

Substantial evidence supported the jury's resolution of the conflict of the evidence in favor of finding the killing was committed with malice. The jury did not find appellant credible as it convicted him of the three thefts. The jury likewise found his self-defense claim was not credible. Jackson told Killgore that defendant insisted on the meeting.

15

Although defendant and his wife testified about repeated threats by Jackson, Jackson's wife disputed that claim, asserting Jackson remained calm and never did more than call defendant a liar and a thief. Additionally, Jodie, Jr. testified he never heard Jackson threaten his father. Most compelling were the independent witnesses and physical evidence contradicting defendant's account of the shooting and instead supporting that defendant shot Jackson in the back as he was trying to run away from defendant who had brought a gun to their meeting.

## IV

## DISPOSITION

Defendant's argument on appeal repeats the same factual assertions he presented to the jury. The jury had ample reason to reject defendant's account and to find that he acted with malice aforethought and not in the unreasonable belief in the need to kill in self-defense.

We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

KING
J.

16