Filed 9/8/15  P. v. Rodriguez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049977 |
| v. | (Super. Ct. No. 11CF1288) |
| ADRIAN RODRIGUEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, W. Michael Hayes, Judge.  Reversed with directions.

Doris M. Leroy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

A jury convicted defendant Adrian Rodriguez of second degree murder (count 1 — Pen. Code, § 187, subd. (a))[1] and active participation in a criminal street gang (often referred to as street terrorism) (count 2 — § 186.22, subd. (a)).  The jury also found true the allegation that defendant vicariously used a firearm for the benefit of a gang during the commission of the murder (§ 12022.53, subds. (b), (e)(1)) and committed the murder for the benefit of a gang (§ 186.22, subd. (b)(1)).  The court sentenced defendant to a prison term of 25 years to life, consisting of 15 years to life for the murder, plus a consecutive 10-year prison term for the firearm enhancement.  The court sentenced defendant to a concurrent term of two years for street terrorism.

Defendant contends (1) the court erred by failing to instruct the jury with CALCRIM No. 3470 on self-defense as to the murder conviction, and (2) insufficient evidence supports the street terrorism conviction.  We agree with both contentions.  Accordingly, we reverse the judgment as to both counts and remand the case to the trial court for retrial of the murder count before a correctly instructed jury and for entry of a judgment of acquittal on the street terrorism charge.

FACTS

*The People's Case*

Around 7:00 or 8:00 p.m. on May 15, 2011, defendant, his friend Arnie Zavala, and Zavala's older sister Denise Ponce went to Zamora Taqueria in Santa Ana.  They had spent most of the day at the home of the mother of Zavala and Ponce, helping her to pack for a move.  The mother had asked Ponce to get some food because everyone was hungry, so Ponce, Zavala, and defendant had driven to Zamora Taqueria.  Inside the taqueria, the threesome placed a "to-go" order.

---

[1]     All statutory references are to the Penal Code.

2

Defendant, a member of the Darkside gang, had the word "Darkside" tattooed on his cheek, the word "assassin" and a capital "A" tattooed on his hairline (for Darkside's pseudonym, Assassins or Tiny Assassins), and "Orange County" tattooed on his upper lip. Zavala, a member of the Southside gang, bore tattoos of the letters "SS" on his right cheek, the number "187" on the right side of his neck (a reference to the Penal Code statute governing murder), and the words "Southside Santa Ana" on the left side of his neck.

Mayra Onofre, a manager of the taqueria, was working at the cash register and taking orders that day. She had arrived there at 2:00 p.m., when most of the tables in the front and back rooms were full, and noticed two regular customers named Michael Manzo and Sergio Maldonado in the back room drinking beer. Manzo had a blue cast on his arm. Maldonado wore a gray shirt.[2]

When defendant and his companions arrived that evening, music was playing. The gray-shirted man was seated at a corner table in the front room. The casted man was walking around, talking loudly to different people and acting aggressively.

Ponce noticed the two strangers staring at Zavala, defendant, and her. The casted man came to the counter and kept asking defendant, "What's up?" Defendant ignored him, then replied, "What's up?", as though to "shut the other guy up."

Sensing the tension, Onofre seated defendant and his group on the opposite side of the restaurant and served them chips and beans while they waited. She expedited their order to try "to get them out of there as fast" as possible. The restaurant was not very crowded at that time.

---

[2] Onofre and the other restaurant employee witnesses knew Manzo and Maldonado only by their first names. The other witnesses referred to them as the man with the cast or the man in the gray shirt, respectively. For brevity and because Manzo and Maldonado were strangers to defendant, Zavala, and Ponce, we refer to Manzo as the casted man and Maldonado as the gray-shirted man, or sometimes as the stranger(s). We mean no disrespect.

According to Ponce, the casted man came to the threesome's table and said in a loud angry voice, "Where are you from?  Are you from Southside?  Fuck Southside." He turned to defendant and asked and answered similar questions, adding, "Fuck Darkside."  And he said, "This is Eastside."  (In a prior inconsistent statement, however, Ponce told detectives in an interview a few days after the incident that the strangers had announced their gang name as "Eastside," after which Zavala and defendant announced their respective gang names, "Southside" and "Darkside.")

The gray-shirted man walked up and was even louder than the casted man. Ponce testified the gray-shirted man looked drunk, smelled like alcohol, and was "talking stupid."

When Onofre brought the food order to defendant's table, the casted man and the gray-shirted man were standing there.  Onofre handed the bag of food to Zavala. Onofre heard someone say, "Let's take it outside."[3]

According to Ponce, the two strangers kept saying they wanted to take it outside, and kept asking, "Are you tripping?"  Ponce stood up between the strangers, who were standing, and Zavala and defendant, who were seated.  Ponce told Zavala "just to leave it alone, to ignore them, that they were drunk," and "let's get our food and leave." Zavala tried to calm down the strangers and said something like, "How about if we go talk outside," or "Let's go talk outside," or "Let's take it outside."  Whatever his exact words were, Zavala conveyed that there was no reason to get "rowdy" in the restaurant and they could talk outside.  Ponce did not expect there to be a fight outside; she thought they would just talk.

Onofre saw them walking outside and saw Ponce hit the casted man on the head with her shoe.  As Ponce hit him, Ponce said, "You're a coward."  Onofre testified

---

[3] At trial, Onofre testified Zavala made the statement, but she had previously told the police it was the casted man.

4

she was certain that the last two persons to step outside were the casted man and Ponce. Onofre saw Ponce run outside, yelling, "Don't do it."

Ponce testified she and the gray-shirted man walked out last, but acknowledged she might have mixed up the two strangers in her mind. In a prior consistent statement a few days after the incident, she had told the police she might have those two men mixed up.

During direct examination of Ponce, the prosecutor showed her a surveillance video that had been taken outside the restaurant and asked her about it. The video was blurry. Ponce could not identify the three people wearing shorts in the first few seconds of the video.[4] Then a figure appeared in the video with his left arm raised, wearing long pants as opposed to shorts. Ponce stated the person's arm looked blue and "like a cast."

Adjusting for Ponce's possible confusion between the two strangers, she testified to the following sequence of events. The stranger who walked out beside her called her "a bitch." Ponce hit his cheek with Zavala's cell phone. Ponce saw defendant fighting with the other stranger (who had exited the restaurant first), and saw Zavala approach those two. Either while Ponce was still inside the restaurant or immediately upon her exit, she saw the man who had been beside her pull out a gun and shoot. Ponce said, "Don't do it." She saw him aim at her brother Zavala, so she pulled the back collar of the man's shirt, choking him and causing him to raise his gun higher. She could see from the painful look on Zavala's face that he had been shot. The shooter quickly shot three more times. Defendant and the man he had been fighting remained standing. Then defendant ducked and dropped to the ground. The shooter ran away.

Onofre testified to her perceptions during those minutes. Looking through the window from inside the restaurant, she saw the gray-shirted man being thrown against

---

[4] Ponce was uncertain whether the gray-shirted man was wearing shorts.

5

a pay phone; Onofre inferred that another person had pushed him into it. "Right after that," Onofre heard three or four gunshots in quick succession. The first three shots sounded small and then there were one or more shots that "sounded louder." She saw the first set of muzzle flashes by a corner. She also saw the casted man on the other side of the street holding a gun and shooting "the opposite way," then running away. "After the shot," the gray-shirted man fell forward to the grass.

Ponce denied that Zavala had a gun. She testified that, although she had told the police in an interview that Zavala had a gun, she had made the statement only because the detectives harassed her. She could not remember who had held the second gun. She had seen her brother with a gun on prior occasions and acknowledged he "was known to carry guns." She testified defendant did not have a gun; he was ducking.

Ponce testified that after the shootings, she took off her shoes, grabbed the bags of food, and ran to the car. Defendant "popped" up at the car and asked where Zavala was. Ponce asked him the same question.

On the day after the shootings, Ponce spoke with Zavala on the phone. Zavala said he had been shot three times. Ponce and their mother begged him to go to the hospital, but he refused because he thought he would be returned to prison. (He had been released only a month before.) He said he would only go to Tijuana for medical treatment. Ponce drove him to San Isidro at the border, where defendant met them to try to help Zavala walk or take a taxi across the border. But Zavala went into shock. A nurse helped Ponce give him CPR, then paramedics took him in an ambulance to the hospital where he died.

The parties stipulated that the other decedent, Maldonado (the gray-shirted man), died of a massive "hemorrhage caused by a through-and-through gunshot wound to the abdomen." From Zavala's body, a Colt .45 caliber bullet was recovered. A bullet and a bullet core consistent with a .44 magnum were recovered from the pay phone

6

enclosure outside the restaurant. The two bullets were definitely fired from different guns. A baseball cap with the letter "A" was also found at the crime scene.

Manzo (the casted man) was never apprehended.

At the time of trial, Valerio Tellez, an older Darkside gang member, was in the hospital and legally unavailable. He had testified at the preliminary hearing under a grant of immunity, after being ordered to do so by the court. His preliminary hearing testimony was read to the jury.

Tellez had at one time dated defendant's sister. Defendant was like family to him. On a night in May 2011, when Tellez was not home, defendant phoned him and told him to "head home quick." Defendant was waiting outside Tellez's house when Tellez got there. Defendant told him that two Eastsiders had come up to his table at a taqueria and hit him up or "exchanged," and that they went outside and fought. Defendant was involved in the fight and heard shots. Defendant's companion jumped in to help defendant in the fight by shooting. Defendant saw one of the Eastsiders "hit the floor." Defendant threw himself to the ground and did not know what was going on. Defendant's companion was also shot, but did not want to go to the hospital.

An officer testified that, in the police interview of Tellez, Tellez said defendant regularly carried a gun and that Zavala had shot the Eastsider. Tellez said Zavala "did it for [defendant]" when defendant was "throwing hooks," i.e., fighting. Tellez said he assumed defendant would have known who had a gun because if a homeboy is "strapped," he is supposed to tell the other homeboys, but Tellez acknowledged that gang etiquette was changing these days.

A gang expert testified that in gang culture, a "hit-up" (such as the question, "Where are you from?") is a form of a challenge. The presence of a facial tattoo can be considered a challenge to a rival. A gang member will usually respond to a hit-up by claiming his gang affiliation. Hit-ups between members of non-allied gangs usually have violent results, ranging from battery to murder. In the expert's experience,

7

most gang-related murders involve a hit-up. A gang-affiliated tattoo, due to its permanence, is a statement that the person is in the gang for life. "Backup" is an unwritten rule requiring a person to support fellow gang members, for example, by joining a fight on the side of a fellow gang member if the fight is going badly and to use a weapon if needed and if one is available.

Darkside gang members often wear black and white Atlanta Braves clothes or hats with an "A" for assassins. There is no relationship, whether ally or rival, between Darkside, Eastside, or Southside gangs. Zamora Taqueria is in an industrial part of Santa Ana not claimed by any gang. Gang members use the adjective "whatever" to describe gangs with no relationship to each other. Gang tattoos might not be considered a challenge as between members of "whatever" gangs encountering each other in an unclaimed area. In a 2004 case where defendant was a victim of a gang shooting (in the expert's opinion), defendant had been a reluctant witness. Generally, a gang member who testifies in court, even on his own behalf, is considered a rat or snitch and is green lighted for assault by other gang members.

*Defense Case*

A.     Defense witnesses other than defendant

A restaurant employee (not Onofre) testified the casted man was not acting "like a normal person" that day, because he and the gray-shirted man had probably been drinking "since the morning." The casted man was being "abusive" to the other customers. The casted man signaled to the employee that he had a gun in his waistband, and told the employee, "I don't want nobody to mess around with you guys."

Another restaurant employee noticed a woman hit the casted man with her shoe and scream, "What are you going to do?"

8

Another customer in the taqueria noticed the casted man was being "loud, [and] moving around from table to table, impatient." The casted man was wearing jeans. The customer saw a woman start hitting the casted man in the back, then stand up and try to hold onto him, "screaming hysterically, 'What are you going to do? Please don't do this." The casted man walked to the door, pushed the door with his left side while holding his right hand near his waistband, and exited the restaurant. Three seconds later, the customer heard shots.

### B. Defendant's testimony

### 1. Direct examination of defendant

Defendant was 24 years old at the time of trial and a Darkside gang member. He had been friends with Zavala since they were teenagers and knew him to be a Southside gang member. Defendant did not have a gun on his person when he arrived at Zamora Taqueria, nor was he aware that Zavala had a gun. Zavala and defendant had not discussed the possibility of trouble at the taqueria, nor was defendant expecting any.

While standing at the counter, defendant turned and saw the gray-shirted man smirking at him. Defendant was aware that Santa Ana gang members would recognize from his and Zavala's tattoos that they were members of Darkside and Southside, respectively.

The casted man was opening boxes to take out beers. The gray-shirted man apparently said something to the casted man because the casted man looked at defendant and said, "What's up?", trying to get defendant to react. When defendant ignored him, the casted man repeated, "What's up, homie?" Defendant said, "Oh, what's up?" At the time, defendant did not know the casted man was an Eastsider.

The cashier directed defendant, Zavala, and Ponce to a table. Defendant looked back and saw the gray-shirted man sitting "at the edge of the chair, kind of

9

leaning forward, looking at" defendant. Defendant, aware of his own facial tattoos, could "already sense that this guy is trying to trip."

The casted man came over first. The gray-shirted man came seconds later. They were both talking, but it was hard to hear them over the loud music. Defendant never heard anyone mention Eastside. Defendant put out his hand and said to the casted man, "Hey, man, relax, relax." Ponce got between them and said, "Let it go, . . . relax." The food arrived. Either the gray-shirted man or the casted man said, "Let's take it outside." Defendant did not know how to interpret that.

Zavala grabbed the food. The gray-shirted man left the restaurant first. Defendant had no time to think. He did not expect a fight.

When defendant exited the restaurant, the gray-shirted man was "crouched down and . . . hopping on his feet." The gray-shirted man rushed at defendant, swinging. Defendant was surprised and stepped back. Then he started fighting, and everything was a "blur," "happening fast." Defendant heard shots, "dropped," and crawled toward a vehicle, then hid between cars. He saw Ponce pass by. He ran up and asked her where Zavala was. Ponce said she did not know. They got in the car and left.

Defendant did not agree to fight with anyone that night. Although he did nothing more than defend himself, he did not call the police because they would not believe him due to his tattoos and criminal history, and because the gang code forbids reporting crimes to the police.

2. Cross-examination of defendant

Defendant testified he was jumped into the Darkside gang when he was 12 or 13 years old. He admitted that if he sees a rival, he might hit them up, especially if he is accompanied by other Darksiders. Defendant acknowledged the following is true. If a gang member is hit-up and is silent about what gang he claims, he is "ranking out" and making his gang look bad. A gang member earns respect for his gang by confronting or hurting rivals or by tagging. In order to be respected, a gang must have a reputation for

10

violence. Defendant got his tattoos in order to represent his gang. He got the tattoos knowing they could cause him problems with rivals. At Zamora Taqueria, defendant was wearing an "A" hat that represents his gang, signifying "assassins."

Defendant admitted he had been convicted in 2010 of possessing methamphetamine for sale and of being an active participant in Darkside; in 2008 of being a gang member with a firearm; in 2004 (as a juvenile) of felony gang graffiti and resisting an officer; and in 2003 of receiving stolen property.

When the prosecutor asked defendant whether he "got right into the fight with" the gray-shirted man, defendant responded, "He left me no choice." The prosecutor asked whether defendant could have defused the situation by waiting inside the restaurant and letting the gray-shirted man go.

The following colloquy ensued:

"[Prosecutor]: And so you made the choice to follow him outside instead of staying inside the restaurant, right?

"[Defendant]: No, I didn't.

"[Prosecutor]: Well, didn't you immediately follow him outside?

"[Defendant]: I didn't agree to go outside with him.

[¶] . . . [¶]

"[Prosecutor]: And so there was nothing that kept you from staying inside the restaurant; correct?

"[Defendant]: No.

"[Prosecutor]: You could have stayed inside.

"[Defendant]: Could have.

"[Prosecutor]: Nobody made you leave that restaurant.

"[Defendant]: No.

"[Prosecutor]: You chose.

[¶] . . . [¶]

11

"[Prosecutor]: Okay. And then you decide to go outside right behind him?

"[Defendant]: Yes."

*Counsels' Closing Arguments to the Jury*

The prosecutor explained that Zavala was the direct perpetrator of the shooting of Maldonado (the gray-shirted man), and that another person may be equally guilty of an offense if he aids and abets the perpetrator. She then focused on the doctrine of natural and probable consequences as a form of aiding and abetting, and explained that if a person agrees to commit a crime, and a natural and probable consequence of that crime is a greater offense, such as murder, the person is also guilty of the greater offense. She argued defendant committed "fighting in violation of [section] 415," knowing that the natural and probable consequence was murder. At one point, she noted it "sounds like" the food bags were dropped by Zavala.

Defense counsel argued murder is not a natural and probable consequence of a fistfight between gang members. Furthermore, he argued defendant did not "unlawfully fight," contending the evidence was unclear as to whether defendant and Zavala agreed to go outside and fight Manzo and Maldonado. He queried, if defendant and Zavala agreed to go outside and fight, then why did Zavala carry the bag of food out? He answered they planned to go out and go home. Defense counsel argued the self-defense instruction concerning mutual combat, which requires the person to try in good faith to stop fighting, was inapplicable because when defendant walked out the door, Maldonaldo "bull-rush[ed]" him, and defendant never had a chance to stop fighting and the law does not "require unreasonable things." He argued that "Manzo was getting his gun out while he was still in the restaurant or right at the entrance."

On rebuttal, the prosecutor argued defendant failed to "walk away" from the fight. She argued he knew and intended, before he walked outside, that there was

12

going to be a fight. He "could have stayed inside" or "he could have said, Hey, man, I don't want any trouble."

## DISCUSSION

*Defendant's Murder Conviction Must Be Reversed Because the Court Failed to Instruct the Jury with CALCRIM No. 3470 on Reasonable Self-Defense.*

Defendant contends the court erred by failing to instruct the jury sua sponte with CALCRIM No. 3470, which he argues "describes the right to self-defense as to a non-homicide crime (in this case, the target crime of fighting), and includes the principles that a person who is being assaulted need not retreat, and that the People have the burden of proof as to the non-existence of the defense."

### A. The Relevant Jury Instructions That Were Given in This Case

With the consent of counsel, the court clerk read the instructions to the jury due to Judge Hays' lingering cough.

The clerk read the following instruction on the natural and probable consequences doctrine: "Before you may decide whether the defendant is guilty of murder, you must decide whether he is guilty of fighting in violation of [section] 415. [¶] To prove that defendant is guilty of murder, the People must prove that: The defendant is guilty of fighting in violation of [section] 415; during the commission of fighting in violation of [section] 415, a coparticipant in that fighting in violation of [section] 415 committed the crime of murder; and under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the murder was a natural and probable consequence of the commission of the fighting in violation of [section] 415."

13

The next relevant instruction read by the clerk — and also the first instruction touching on self-defense of any kind — concerned imperfect self-defense in relation to voluntary manslaughter, and erroneously transposed defendant for Zavala as the person who used deadly force: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense or imperfect defense of another. [¶] If you conclude the defendant acted in complete self-defense or defense of another, his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense or defense of another and imperfect self-defense or imperfect defense of another depends on whether the defendant's belief in the need to use deadly force was reasonable. [¶] The defendant acted in imperfect self-defense or imperfect defense of another if: The defendant actually believed that he or Arnie Zavala was in imminent danger of being killed or suffering great bodily injury; and the defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; but at least one of these beliefs was unreasonable. [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. [¶] . . . [¶] 'Great bodily injury' means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense or imperfect defense of another. If the People have not met this burden, you must find the defendant not guilty of murder."

Thus, although the instruction on imperfect self-defense told the jury that a finding of "complete self-defense" would require a not guilty verdict, it did not instruct the jury on the law of "complete self-defense."

Shortly thereafter, the clerk instructed the jury that the People alleged defendant committed fighting in violation of section 415 and that CALCRIM No. 2688 states what the People must prove for that crime.

14

The clerk then read the jury more instructions. Six reporter's transcript pages later, the clerk read CALCRIM No. 2688 on disturbing the peace by unlawfully fighting in public. But the clerk did not identify the crime that was the subject of the instruction. Her reading omitted the first sentence of the pattern instruction, which would have specified that the target offense being described was disturbing the peace in violation of section 415. Instead, the clerk read the jury solely the following: "To prove that the defendant is guilty of this crime, the People must prove that: The defendant willfully and unlawfully fought or challenged someone else to fight; the defendant and the other person were in a public place when the fight occurred or the challenge was made; and the defendant did not act in self-defense or in defense of someone else. [¶] Someone commits an act willfully when he or she does it willingly or on purpose."

But the jury was not then instructed on the usual law of self-defense. Instead, immediately after the jury was told that in order to find defendant guilty of this unidentified crime they must find he was not acting in self-defense, the clerk read CALCRIM No. 3471 on the law of self-defense in *mutual combat*, which *limits* the right of self-defense, as follows: "A person who engages in mutual combat has a right to self-defense only if: He actually and in good faith tried to stop fighting; he indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting; and he gave his opponent a chance to stop fighting. [¶] If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight. [¶] A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."[5]

---

[5] This sequence of instructions — i.e., the giving of the instruction defining unlawful fighting without identifying the name of the crime being defined, immediately followed by the instruction on self-defense in mutual combat — might well have suggested to the jury that the two instructions were intertwined, i.e., that defendant was

15

## B. Self-Defense in Non-Homicidal Crimes (CALCRIM No. 3470) vs. Self-Defense in Mutual Combat (CALCRIM No. 3471)

CALCRIM No. 3470 was not requested and was not given. It is entitled "Right to Self-Defense or Defense of Another (Non-Homicide)." The pattern instruction provides (as simplified by deleting brackets, numbers, some paragraph symbols, feminine gender references, and inapplicable sections): "Self-defense is a defense to [the charged or target crime]. The defendant is not guilty of that crime if he used force against the other person in lawful self-defense or defense of another. The defendant acted in lawful self-defense or defense of another if: The defendant reasonably believed that he or someone else was in imminent danger of suffering bodily injury; the defendant reasonably believed that the immediate use of force was necessary to defend against that danger; and the defendant used no more force than was reasonably necessary to defend against that danger. [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. . . . [¶] . . . [¶] The slightest touching can be unlawful if it is done in a rude or angry way. . . . [¶] . . . [¶] If you find that the victim threatened or harmed the defendant or others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable. [¶] . . . [¶] Someone who has been threatened or harmed by a person in the past is

_____

engaged in a mutual combat as a matter of law, and the right of self-defense would arise only in accordance with the heightened requirements described in CALCRIM No. 3471.

The following bracketed section of CALCRIM No. 3471 was not given: "[However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to try to stop fighting(,/or) communicate the desire to stop to the opponent[, or give the opponent a chance to stop fighting].]"

The jury was also instructed: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." (CALCRIM No. 3472.)

16

justified in acting more quickly or taking greater self-defense measures against that person.  [¶] . . . [¶] A defendant is not required to retreat.  He is entitled to stand his ground and defend himself and, if reasonably necessary, to pursue an assailant until the danger of death or bodily injury has passed.  This is so even if safety could have been achieved by retreating.  [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense or defense of another.  If the People have not met this burden, you must find the defendant not guilty of the charged crime."

CALCRIM No. 3470, as quoted above, faithfully states the law on self-defense for non-homicidal crimes, as set forth in statutes and case law.  A "party about to be injured" may lawfully resist "the commission of a public offense."  (§ 692.)  "Resistance sufficient to prevent the offense may be made by the party about to be injured" to "prevent an offense against his person."  (§ 693.)  The prosecution must prove beyond a reasonable doubt the absence of self-defense, when the issue is properly presented.  (*People v. Adrian* (1982) 135 Cal.App.3d 335, 339-340; § 1096; *People v. Banks* (1976) 67 Cal.App.3d 379, 384.)  "A person who without fault on his part is exposed to a sudden felonious attack need not retreat."  (*People v. Collins* (1961) 189 Cal.App.2d 575, 588.)

A person who engages in *mutual combat*, however, loses the "right to use reasonable force to defend himself."  (*People v. Johnson* (2009) 180 Cal.App.4th 702, 711.)  He "has no privilege to stand his ground and defend."  (1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Defenses, § 78, p. 519.)  He can only regain the right to self-defense by trying to withdraw from the fight and by communicating this to his opponent. (*Id.* at § 79, p. 521.)[6]

---

[6]    For convenience and brevity, we use masculine references in this opinion when discussing mutual combat and self-defense.

Thus, a mutual combatant defendant must meet additional conditions in order to assert self-defense. CALCRIM No. 3471 instructs the jury on these elevated requirements. It tells the jury that a person engaged in mutual combat has a right to self-defense only if he tried to stop fighting, communicated this to his opponent, and gave his opponent a chance to stop fighting, but nonetheless the opponent continued fighting.

Logically, if some evidence supports a finding of reasonable self-defense and other evidence supports a finding of mutual combat, CALCRIM No. 3470 should be given first, describing the right to self-defense and the People's burden to prove its nonexistence, followed by the limitation of that right in a mutual combat situation as described in CALCRIM No. 3471.

C. Mutual Combat vs. Unlawful Fighting

In *People v. Ross* (2007) 155 Cal.App.4th 1033 (*Ross*), the Court of Appeal asked and answered a critical question: "What distinguishes 'mutual' combat from combat in which one of the participants retains an unconditional right of self-defense?" (*Id*. at p. 1044.) *Ross* defined "mutual combat" as "fighting by mutual intention or consent, as most clearly reflected in an express or implied *agreement* to fight." (*Id*. at pp. 1046-1047.) "[T]here must be evidence from which the jury could reasonably find that *both combatants actually consented or intended to fight before the claimed occasion for self-defense arose*." (*Id.* at p. 1047.)

*Ross* explained why the legal term "mutual combat" requires an advance agreement and is thus narrower than its connotations in "ordinary speech." (*Ross*, *supra*, 155 Cal.App.4th at p. 1044.) (For example, mutual combat, in a legal sense, does *not* encompass a mere "reciprocal exchange of blows" or "any violent struggle between two or more people, however it came into being." (*Id* at pp. 1044-1045.)) *Ross* offered the following illustration explaining the necessity for a more restricted definition of the legal term "mutual combat": "If A walks up to B and punches him without warning, and a

18

fight ensues, the fight may be characterized as 'mutual combat' in the ordinary sense of those words. But as this example demonstrates, the phrase so understood may readily describe situations in which the law plainly grants one of the combatants a right of self-defense. In the case above, B would be entitled under the law of this state to punch A immediately, without further ado, provided he acted out of an actual and reasonable belief that such action was necessary to avert imminent harm [citation], and he used no more than reasonable force [citation]. That right cannot be forfeited or suspended by its very exercise. Yet that is the effect of relying on the everyday meaning of 'mutual combat.' B's entitlement to strike back in self-defense would then be conditioned, absurdly, on his first refusing to fight, communicating his peaceable intentions to his assailant, and giving his assailant an opportunity to desist. By then, of course, his assailant might have beaten him senseless." (*Id.* at p. 1044, fn. omitted.)

An agreement to fight, i.e., mutual combat, is not a requirement for a violation of section 415. Rather, a person is guilty of disturbing the peace in violation of section 415 if the person "unlawfully fights in a public place or challenges another person in a public place to fight." The critical element of a section 415 violation is that the person engage in "unlawful" fighting. Of course, fighting in self-defense is lawful. Thus, to find a violation of section 415, the jury must necessarily find that the fighter was not engaged in self-defense. (See *People v. Adrian, supra*, 135 Cal.App.3d at p. 340 ["Self-defense negates culpability for assaultive crimes"].)

CALCRIM No. 2688 instructs the jury on disturbing the peace by unlawfully fighting in public. It requires that the defendant (1) challenge someone to fight, (2) in a public place, and (3) *not* in self-defense or in defense of someone else. Not surprisingly then, the Bench Notes to CALCRIM No. 2688 state: "If there is sufficient evidence of self-defense or defense of another, the court has a *sua sponte* duty to instruct on that defense. . . . (See CALCRIM Nos. 3470– 3477.)"

19

D. A Court May Not Instruct the Jury With CALCRIM No. 3471 or CALCRIM No. 2688 Without Also Instructing It With CALCRIM No. 3470

The Bench Notes to CALCRIM No. 3471 remind the court the instruction must be given together with CALCRIM No. 3470. If the jury finds that the defendant did *not* engage in mutual combat or that the defendant did engage in mutual combat but withdrew and thereby regained his right to reasonable self-defense, the jurors must be equipped to evaluate whether the defendant properly exercised his right to reasonable self-defense.

As stated above, the Bench Notes to CALCRIM No. 2688 also remind the court the instruction must be given together with CALCRIM No. 3470. In order for the jury to determine whether the defendant engaged in unlawful fighting, the jurors must be equipped to evaluate whether he did *not* fight in self-defense (an element of the crime).

E. The Court Prejudicially Erred by Failing to Instruct the Jury With CALCRIM No. 3470

A court bears a sua sponte duty to instruct the jury on the essential elements of an offense (*People v. Flood* (1998) 18 Cal.4th 470, 504), and "'on the general principles of law governing the case,'" i.e., "'"those principles of law *commonly* or closely and openly connected with the facts of the case before the court"'" (*People v. Michaels* (2002) 28 Cal.4th 486, 529-530). A court also has a sua sponte duty to instruct on a defense if the defendant appears to rely on the defense, or if substantial evidence supports the defense and it is not inconsistent with the defendant's theory of the case. (*People v. Barton* (1995) 12 Cal.4th 186, 195.) "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt . . . .'" (*People v. Salas* (2006) 37

20

Cal.4th 967, 982; see also *People v. Lemus* (1988) 203 Cal.App.3d 470, 477 [even if evidence is incredible, court must give "'instruction based thereon, for that is a question within the [jury's] exclusive province'"].)

"We review defendant's claims of instructional error de novo." (*People v. Johnson*, *supra*, 180 Cal.App.4th at p. 707.) We determine whether the court fully and fairly instructed on the applicable law. (*People v. Cain* (1995) 10 Cal.4th 1, 35.) In determining whether prejudicial instructional error occurred, a reviewing court considers, inter alia, the instructions as a whole and counsel's closing arguments to determine whether the instructional error "would have misled a reasonable jury." (*Id.* at p. 37.)

Legally incomplete "instructions relating to an element of the crime" (*People v. Hughes* (2002) 27 Cal.4th 287, 351) are subject to the *Chapman* standard of prejudice (*id* at p. 352), i.e., whether the error was harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18). In *People v. Rhodes* (2005) 129 Cal.App.4th 1339, we applied the *Chapman* standard of prejudice to the court's erroneous failure to instruct the jury that an assailed person exercising self-defense need not retreat (*id.* at p. 1346) and examined whether it appeared beyond a reasonable doubt that the error did not contribute to the verdict (*id.* at p. 1347).

Here, on two independent grounds, the court had a sua sponte duty to instruct the jury with CALCRIM No. 3470. First, an element of the offense of unlawful fighting is that the defendant did not act in self-defense. Second, the defense theory was that defendant acted in self-defense and did not agree to mutual combat.

Because of the court's failure to give CALCRIM No. 3470, the jury was not fully and fairly instructed. Nor was the error cured by defense counsel's assertion in his closing statement that the elevated self-defense requirements for mutual combat were inapplicable because the law does not "require unreasonable things." Defense counsel did not advise the jury on the requirements for reasonable self-defense and, in any case,

21

"arguments of counsel are no substitute for instructions from the court." (*People v. Harris* (2008) 43 Cal.4th 1269, 1320.)

The prosecution bore the burden of proving beyond a reasonable doubt that defendant engaged in mutual combat, and that he was not fighting in self-defense. (*Ross*, *supra*, 155 Cal.App.4th at p. 1050.) Substantial evidence supported defendant's contention he did not make or accept a challenge to fight. The defense theory was that defendant left the restaurant, reasonably fought back when Maldonado assaulted him, and "stood his ground, in a place he had a right to be — exiting the restaurant with his food." Defendant had no obligation to remain in the restaurant. A person has no "duty to curtail his or her activities to avoid an encounter with a person who has threatened to attack. 'For one may know that if he travels along a certain highway he will be attacked by another with a deadly weapon, and be compelled in self-defense to kill his assailant, and yet he has the right to travel that highway, and is not compelled to turn out of his way to avoid the expected unlawful attack.' (*People v. Gonzales* (1887) 71 C[al]. 569, 578 . . . .)" (1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Defenses, § 77, pp. 518-519.)

The jury may have found the prosecution failed to prove beyond a reasonable doubt that defendant engaged in mutual combat. Furthermore, if the jury had been properly instructed, it might have found the prosecution failed to prove beyond a reasonable doubt that defendant did *not* act in reasonable self-defense. Unfortunately, the instructional error prevented the jury from determining whether defendant acted in reasonable self-defense and should therefore be acquitted of the predicate crime of unlawful fighting in public and of murder under the natural and probable consequences theory. As defendant argues, "the jury had no way to know that it had not been fully instructed."

22

As a result of the instructional error, the jury was fully instructed on the prosecution's theory of the case, but not on the defense's theory. The error was not harmless beyond a reasonable doubt. Defendant's murder conviction must be reversed.

*Defendant Must Be Acquitted of the Street Terrorism Charge due to Lack of Substantial Evidence.*

Defendant contends his street terrorism conviction must be reversed because there was no substantial evidence he promoted, furthered, or assisted in any felonious conduct by members of the Darkside gang.

The Attorney General concedes that defendant and Zavala were members of different gangs (Darkside and Southside, respectively), but argues defendant "acted collectively with Zavala who 'backed up' Darkside by shooting [the Eastsider] 'for [defendant].'" She argues that, "[w]hile Zavala was not a member of Darkside, he was acting on the gang's behalf when he shot the Eastsider for [defendant]."

We apply the substantial evidence test to determine whether the People introduced sufficient evidence to prove each element of street terrorism beyond a reasonable doubt. (*People v. Cuevas* (1995) 12 Cal.4th 252, 260-261.) We "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 315–319.)

Section 186.22, subdivision (a), defines the crime of street terrorism and provides in relevant part: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully *promotes, furthers, or assists in any felonious criminal*

23

*conduct by members of that gang*, shall be punished . . . ." (Italics added.) In *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1128, a divided Supreme Court held that under the plain meaning of this statutory language, an active gang participant does *not* violate section 186.22, subdivision (a), by committing a felony while acting alone. (*Rodriguez*, at p. 1129 (plur. opn. of Corrigan, J.); *id*. at p. 1140 (conc. opn. of Baxter, J.).) Justice Corrigan's plurality opinion interpreted section 186.22, subdivision (a)'s phrase "'that gang'" to "clearly refer[] back to the gang in which the defendant is an active participant." (*Id.* at p. 1131 (plur. opn. of Corrigan, J.); accord, *id.* at p. 1140 (conc. opn. of Baxter, J.).)[7] A "defendant must willfully advance, encourage, contribute to, or help members of *his gang* commit felonious criminal conduct." (*Id.* at p. 1132 (plur. opn. of Corrigan, J.), original italics omitted & italics added.) In other words, a substantive gang offense under section 186.22, subdivision (a), "requires the participation of at least two members of the *same gang* in felonious conduct." (*People v. Vega* (2015) 236 Cal.App.4th 484, 503, italics added [citing *Rodriguez*].)

Because no evidence showed defendant participated with another Darkside gang member in the incident, he must be acquitted of the street terrorism charge.

---

[7] Because Justice Baxter concurred in the *Rodriguez* judgment on the narrowest grounds, his concurring opinion represents the *Rodriguez* holding. When a fragmented court decides a case and no single rationale explaining the result enjoys a majority assent, the court's holding may be viewed as the position concurring in the judgments on the narrowest grounds. (*Marks v. United States* (1977) 430 U.S. 188, 193.)

## DISPOSITION

The judgment is reversed on both counts 1 and 2. The trial court is directed to enter a judgment of acquittal on count 2.


IKOLA, J.

WE CONCUR:


ARONSON, ACTING P. J.


THOMPSON, J.